**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD CHAKEJIAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **C. A. No. 07- 2211** |
| **vs.** | ) | |
| | ) | |
| **EQUIFAX INFORMATION SERVICES LLC** | ) | **CLASS ACTION** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

    **AND NOW** on this _____ day of _____, 2010, upon consideration of the Motion

for Summary Judgment filed by Defendant Equifax Information Services LLC's, and Plaintiff's

Response in Opposition thereto, it is hereby **ORDERED** that the Motion is **DENIED**.


                              _____

                              BRODY,             J.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD CHAKEJIAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **C. A. No. 07- 2211** |
| **vs.** | ) | |
| | ) | |
| **EQUIFAX INFORMATION SERVICES LLC** | ) | **CLASS ACTION** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Richard Chakejian, by and through undersigned counsel, hereby opposes the Motion for Summary Judgment of Defendant Equifax Information Services, LLC ("Motion"). For the reasons set forth in the accompanying Memorandum of Law, which is incorporated by reference herein, the Motion should be denied.

**FRANCIS & MAILMAN, P.C.**

*/s/ James A. Francis*
JAMES A. FRANCIS
JOHN SOUMILAS
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

**DONOVAN SEARLES, LLC**
DAVID A. SEARLES
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 732-6067

DATE: April 6, 2010                    Attorneys for Plaintiff and the Class

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD CHAKEJIAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **C. A. No. 07- 2211** |
| **vs.** | ) | |
| | ) | |
| **EQUIFAX INFORMATION SERVICES LLC** | ) | **CLASS ACTION** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard Chakejian, on behalf of himself and the members of the Class certified by this Court, *Chakejian v. Equifax Information Services LLC*, 256 F.R.D. 492 (E.D. Pa. 2009), hereby responds in opposition to Defendant Equifax Information Services LLC's Motion for Summary Judgment (Doc. 74)(the "Motion"). For the reasons discussed below, Defendant's Motion should be denied.

**I.    INTRODUCTION**

Erect a straw man, then knock it down. That is the approach taken by Equifax in its Motion. The Motion portrays the entirety of the case as presenting a narrow claim of first impression, namely that Equifax failed to disclose its public records vendor. It then asserts that because neither the FTC nor a court had ruled against it on that very narrow claim, Equifax could not have acted willfully in light of the *Safeco* decision.

As discussed in detail below, neither the claims involved nor the factual record are remotely as narrow as Equifax portrays. The claims in this case do not arise solely from Equifax's mere omission or failure to disclose a public records vendor. Rather, they arise from numerous affirmative misrepresentations, and even patent lies, that Equifax makes in

1

important disclosures under the Fair Credit Reporting Act that it sends to consumers following a public records dispute. Especially when brought under the very statute designed to regulate it, Equifax cannot plausibly maintain that there is anything "cutting edge" about legal claims that are based upon the simple premise that its legally required disclosures must be truthful.

The detailed evidentiary record that Plaintiff has developed so clearly demonstrates that Equifax's form letters were false and deceptive that Equifax never really tries to rebut this fact. Instead, it focuses on sideshows, such as its untrue contention that Plaintiff has no standing to assert a claim under FCRA section 1681i(a)(6)(B)(iii) because he never requested a description of Equifax's investigation procedures.  In addition to being wrong, such an argument would be of no consequence in any event because Equifax admittedly sends all of its required disclosures at once following its investigation of a credit dispute.  Likewise, Equifax focuses upon ChoicePoint's role in the investigation process, and whether it is a "furnisher of information" which, as the Court will see, is a highly disputed issue of fact.  However, in addition to the fact that ChoicePoint's role is not dispositive on the issue of whether Equifax's letters were false, Equifax presents no challenges whatsoever to Plaintiff's claim that it violated FCRA section 1681i(a)(6)(A) by not providing Plaintiff with the truthful results of its reinvestigation of his dispute, a claim which does not require any request from the consumer or turn upon the disclosure of a furnisher.

As for the evidentiary record regarding the willfulness of Equifax's non-compliance, it is far more comprehensive than the sparse background Equifax presents.  Deposition testimony and admissions of its own witnesses make it clear that Equifax was fully aware that the letters it sent to Mr. Chakejian and Class members were false and misleading, but has done nothing to correct

them.  Instead, Equifax continues to use the same form letter to this day.   Against such a record, *Safeco* hurts rather than helps Equifax.

## II.   NATURE AND HISTORY OF THE LITIGATION

Plaintiff brought this class action on behalf of all Pennsylvania consumers who were sent the form letter attached as Exhibit A to the Amended Complaint (the "Letter") by Equifax. Plaintiff contends that the Letter misrepresented to consumers what Equifax did to investigate their public records disputes.  Public records reported by Equifax include bankruptcies, tax liens and civil judgments.  The Class certified by this Court in its decision in March 2009 includes all Pennsylvania consumers to whom, beginning October 1, 2005 and continuing through the resolution of this action, in response to a dispute over a public record, Defendant sent the Letter. 256 F.R.D. at 503.

Following class certification, Plaintiff and Equifax contested the form of Notice to be sent to the Class.  By Order of October 14, 2009 (Doc. 67), the Court adopted Plaintiff's Revised Proposed Notice, as modified by the Court.  Notice was then sent to 10,281 Pennsylvania Class members on January 4, 2010. (Doc. 73).

The Court has set a briefing schedule for dispositive motions.  (Doc. 71).  In addition, a final pretrial conference has been scheduled for June 2, 2010, and a jury trial is to be held on June 7, 2010.  (Doc. 72).

Plaintiff asserts that the form Letter is materially misleading in at least five separate respects, and that a reasonable jury could so find.

The disclosure at issue here is practical and important, as Equifax knows.  Consumers rely on it to identify who is actually reporting the disputed public record to Equifax so that they can contact that entity, if need be.  In the Letter, Equifax advises consumers that they should

contact Equifax's "source" of public record information, courthouses, should they require further follow-up or have any "questions or concerns."  As he testified in his deposition, that is precisely what Representative Plaintiff Richard Chakejian wanted to do so that he could correct a damaging, erroneously reported bankruptcy.  Yet Equifax did not reveal the actual source of the information to Plaintiff, but rather, in the Letter, directed him to Room 400 of the "Robert NC NIX Federal Buil[sic]"  in Philadelphia.  The Nix "Buil", however, had no error, and the Building was not Equifax's true source of the erroneous information.  The true source was another large consumer reporting agency that Equifax never disclosed to Mr. Chakejian.  Thus, Plaintiff was deprived of the statutorily mandated disclosure that he was seeking and was entitled to, which could have helped him correct a serious credit reporting error.

Plaintiff contends in this case that the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* ("FCRA"), requires Equifax to accurately and truthfully disclose to consumers what it does in connection with investigating a consumer dispute, who it contacts, and who is the actual source of the information.[1]  Unlike other FCRA cases that are primarily brought on an individual basis, this case centers exclusively upon the contents and veracity of a single Equifax form disclosure, not the accuracy or inaccuracy of a credit report, whether a reasonable investigation was conducted in connection with a dispute or whether a disputed item was deleted.[2]  By not

---

[1]      *See*, *e.g*., 15 U.S.C. §1681i(a)(6).

[2]      Equifax asserts, even though this case only challenges the veracity and legality of representations contained in the form Letter at issue, that somehow the lawsuit must embrace all possible FCRA claims that Plaintiff and the Class could have ever asserted to the extent that it exacts a *res judicata* effect as to those other claims should they exist.  Def. Mem. at p.14, fn. 1.  This is clearly not the case.  *See Nafar v. Hollywood Tanning Systems, Inc.*, 2009 WL 238666, *9 (3d Cir. Aug. 5, 2009) (non-precedential) (district court may redefine class to exclude certain claims if it determines this would avoid potential *res judicata* preclusion); *Summerfield v. Equifax Information Services LLC*, 2009 WL 3234191, *13 (D.N.J. Sept. 30, 2009, *recon. denied*, Jan. 4, 2010) (denying motion for reconsideration of class certification and relying on *Nafar*).

providing truthful and accurate information regarding its public records source, Equifax sets consumers up for a veritable wild goose chase — running to a courthouse to dispute what Equifax has told them is an erroneous court record, only to find out that the court is reporting nothing incorrect.

Plaintiff here seeks statutory damages of $100 to $1,000 per violation for members of the Class for this inaccurate and false disclosure, as well as punitive damages.  Like other parts of the Consumer Credit Protection Act, the FCRA has a statutory damages provision, set forth at section 1681n.  When a defendant uniformly fails to provide consumers with a statutorily mandated disclosure or where such a disclosure or letter is false or misleading, class certification is appropriate, as this Court held.  256 F.R.D. at 503 (class should be certified for a statutory damages claim with respect to the cause of action that Equifax committed a willful violation of the FCRA).  This Court was later joined in that conclusion by the District of New Jersey in *Summerfield v. Equifax Information Services LLC*, 2009 WL 3234191 (D.N.J. Sept. 30, 2009, *recon. denied*, Jan. 4, 2010) (certifying claim for statutory damages on behalf of class of New Jersey consumers who were sent Letter by Equifax).[3]

### III.   STATEMENT OF UNDISPUTED AND DISPUTED FACTS

Pursuant to Judge Brody's Preferred Procedure for summary judgment practice, Plaintiff and the Class hereby outline the disputed and undisputed facts categorized according to issue:

---

[3]   Equifax sought Rule 23(f) interlocutory review of both class certification decisions, and the Third Circuit denied the petition in each case.  *Summerfield v. Equifax Information Services LLC*, No. 10-8005 (3d Cir. March 4, 2010) (Rule 23(f) petition *denied*); *Chakejian v. Equifax Information Services LLC,* No. 09-8020 (3d Cir. May 18, 2009) (same).

A.    **Undisputed Facts**

1.    **The Representative Plaintiff's experience: misled by Equifax**

In 2005, a business competitor apparently seeking to gain an edge filed a fraudulent involuntary bankruptcy against Mr. Chakejian and his wife Jacqueline in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  *See* Deposition of Richard Chakejian taken on July 18, 2008 (hereafter "Chakejian Dep. at _____") at pp. 114-115, attached hereto as Exhibit A.  Mr. Chakejian has lived in Chester Springs, and has been involved in the real estate business for most of his career.  *Id.* at pp. 8-9, 24.

Mr. Chakejian successfully fought the fraudulent filing.   After a hearing, the petition was dismissed and Bankruptcy Court Judge Raslavich issued an order enjoining the individuals who filed the petition from any future bankruptcy filing against Mr. and Mrs. Chakejian.  *See* Order of the U.S. District Bankruptcy Court for the Eastern District of Pennsylvania dated May 17th, 2006 (the "May 17th Order"), attached hereto as Exhibit B).   Additionally, pursuant to the May 17th Order, all references regarding the fraudulent filing (the "bankruptcy record") were to be stricken from the Chakejians' credit records.  *Id.*.  Equifax admits, and it is therefore undisputed, that the bankruptcy court record should not have been reporting on Mr. Chakejian's credit report, and that Equifax should have deleted it from Mr. Chakejian's credit file.  *See* Deposition of Shawn DeGrace, taken on June 24, 2008 (hereafter "DeGrace Dep. at ___"), at pp. 94-96, attached hereto as Exhibit C.[4]

Nevertheless, the bankruptcy filing made its way onto Mr. Chakejian's Equifax credit report.   Mr. Chakejian noticed the error in January 2007, and promptly disputed the bankruptcy record by sending a letter to Equifax dated January 16, 2007 which specifically identified and

---

[4]    Ms. DeGrace is Equifax' Director of Data Management and was produced for deposition, in part, as a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6).

explained the erroneous record, and enclosed the bankruptcy court's May 17 Order and the credit report showing the record.  *See* copy of Mr. Chakejian's letter dated January 16th, 2007, attached hereto as Exhibit D.

**2.**     **The representations contained in the Letter Equifax sends consumers.**

Later in January, Mr. Chakejian received a form Letter from Equifax dated January 26, 2007, which Equifax characterized as describing the "results" of Equifax's investigation of his dispute.  *See* Letter, attached hereto as Exhibit E.  In the Letter, Equifax made the following representations:

1.    That Equifax itself had contacted the "source" of the erroneous bankruptcy record, which it identified as "***Eastern District of PA, Robert NC NIX Federal Buil [sic], 900 Market St RM 400, Philadelphia PA 19107-4293***" (emphasis in original);

2.    That it had contacted the source (*i.e.*, "NIX Federal Buil") "directly;"

3.    That Equifax had "verified" that the "item" "belong[ed]" to Mr. Chakejian;

4.    That if Mr. Chakejian had any questions regarding the information provided to Equifax, he should contact the "NIX Federal Buil" directly; and

5.    That as part of its usual process (under the "Notice to Consumers" section) upon receiving his dispute, Equifax had:

   i.    provided notification of his dispute to the bankruptcy court;

   ii.   that the bankruptcy court had "review[ed] the information" regarding his dispute,

   iii.  "conduct[ed] an investigation with respect to the disputed information,

   iv.   and report[ed] the results back to [Equifax]."

*Id*.  As set forth, *infra*, it is undisputed that each of these representations was false.

After receiving the Letter, and having thought that he had solved the problem almost a year before in the bankruptcy court, Mr. Chakejian began to doubt himself and question whether

7

his credit rating would ever be corrected.  Chakejian Dep. at pp. 89, 92.  He felt misled, violated and possibly tricked on several levels, because he knew that the bankruptcy court had been reporting the record correctly.  *Id.* at p. 73-74, 79, and 91; *see* generally Chakejian testimony at pp. 73-91.

Following a phone call with Equifax in which one of its operators suggested that the May 17 Order he sent in might have been fake, and that he needed a certified copy with a court seal on it, Mr. Chakejian was forced to take the time out of his day, and visit Room 400 of the Nix Federal Building himself.  *Id.* at p. 90.  He learned that the bankruptcy court was indeed reporting everything correctly. He then paid for and obtained a certified copy of the May 17 Order to again try to prove to Equifax that the involuntary bankruptcy filing was erroneous.  *Id.* at p. 150.

Mr. Chakejian sent another dispute letter to Equifax on March 4, 2007, and he enclosed a copy of the May 17 Order that he had obtained from the bankruptcy court.  *See* Chakejian dispute correspondence dated March 4, 2007, attached hereto as Exhibit F.  This time, Equifax responded with a letter in which it stated that it had deleted the bankruptcy after having contacted the Robert NC Nix Federal Building directly again (false again).  *See* Deposition of Alicia Fluellen taken on June 24, 2008, (hereafter "Fluellen Dep. at ___") at pp. 78-79, attached hereto as Exhibit G,[5] as well as the same contents of the January 26 Letter.   Though Mr. Chakejian was relieved that the bankruptcy record was removed, the Equifax letter was false as well for the reasons set forth below.

As of result of Equifax's misrepresentations, and being given the run-around over a period of several months, Mr. Chakejian suffered some anxiety, discomfort, frustration, a loss of

---

[5]    Alicia Fluellen is Equifax's Director of Customer Care, and was produced for a deposition pursuant to Fed. R. Civ. P. 30(b)(6).

a few hours of his time and the out-of-pocket expense incurred for a certified record from the bankruptcy court. Chakejian Dep. at pp. 74, 85-92.  According to Equifax, no creditor looked at Mr. Chakejian's credit report during that time period.  *Id.* at pp. 112-113, 127.

> ### 3.   Equifax's never contacts the "source" in response to a consumer public records dispute, and there is no contact with, or investigation by any court.

For the time period at issue in this action,[6] Equifax purchased the public records data it sells (such as and including the Chakejian court record originating from the fraudulently-filed involuntary bankruptcy) from another large publicly-traded corporation named ChoicePoint. *See* Fluellen Dep. at pp. 12-15; DeGrace Dep. at p. 82.   Like Equifax, ChoicePoint is a large corporation that admittedly plays a huge national role in the sale, dissemination, reporting and handling of consumer report information, whose activities are regulated by the FCRA.[7] *See* http://www.Choicepoint.com.

Relating to public records, there is no dispute that no one from Equifax ever visits or obtains any information from courts or courthouses.  DeGrace Dep. at p. 41.  Rather, Equifax buys certain public records data from ChoicePoint, which sells this information to other companies as well.  *Id.* at pp. 24-27.  The information that Equifax obtains from ChoicePoint is never the full or complete court record or docket; rather it is a series of discrete items of information electronically populated and transmitted to Equifax, such as the person's name, address, bankruptcy chapter type and final status.   *Id.* at pp. 26-28, 30-31.

---

[6]     The role performed by ChoicePoint is now performed by Lexis-Nexis.

[7]     *See, e.g.*, *Boris v. ChoicePointChoicePoint Services Inc.,* 249 F.Supp.2d 851 (W.D. Ky. 2003); *Joiner v. ChoicePointChoicePoint Services, Inc.,* 2006 WL 2669370 (W.D. N.C. 2006); *Ewbank v. ChoicePointChoicePoint Inc.,* 551 F.Supp.2d 563 (N.D. Tex. 2008); *Bradley v. ChoicePointChoicePoint Services, Inc.,* 2007 WL 2844825 (E.D. Pa. 2007); *Campos v. ChoicePointChoicePoint, Inc.,*  237 F.R.D. 478 (N.D. Ga. 2006); *Obabueki v. ChoicePointChoicePoint, Inc.,*  236 F. Supp.2d 278 (S.D. N.Y. 2002).

As for disputes, pursuant to a contract between Equifax and ChoicePoint, if a consumer disputes a public record appearing on her Equifax credit report with Equifax, Equifax "relays" notification of the dispute electronically (like an email) to ChoicePoint via a record called an Automated Consumer Dispute Verification ("ACDV"), and according to Equifax, its contract with ChoicePoint requires that ChoicePoint handle the investigation of the dispute.   DeGrace Dep. at pp. 41; s*ee* also January 26, 2007 ACDV regarding Mr. Chakejian's dispute (filed under seal).   As a matter of policy and practice, Equifax does not send the consumer's dispute correspondence and/or any corroborative documentation to ChoicePoint.   Fluellen. Dep. at pp. 69-70.

Nobody from Equifax visits, communicates with or directly contacts any court or courthouse in connection with a consumer dispute of a public record dispute.  Fluellen Dep. at p. 43; DeGrace Dep. at p 41.   It also undisputed that in connection with a routine dispute of a bankruptcy record like Mr. Chakejian's, that nobody--*even from ChoicePoint*--goes to or contacts the courthouse; if anything, a ChoicePoint employee may check the public record online through PACER.  DeGrace Dep. at p. 83.   In fact, Equifax is uncertain as to whether anyone at ChoicePoint did anything at all to investigate to investigate Mr. Chakejian's dispute.  DeGrace Dep. at p.82, ll. 20-25.

Equifax has admitted that, consistent with its usual procedures, no one from ChoicePoint ever contacted, visited or had any communication with anyone at the Nix Federal Building at 900 Market Street in connection with Mr. Chakejian's dispute.  DeGrace Dep. at p. 83.   Equifax also never sent his dispute letter or the May 17 Order of Judge Raslavich to the Nix Federal Courthouse, or even ChoicePoint for that matter.  Fluellen. Dep. at pp. 69-70.   The fact is that the

only person who had any communication with the Nix Federal Building was Mr. Chakejian himself when he visited in utter disbelief after receiving the Letter.

It is thus undisputed that there was never any communication at all between anyone at Equifax or ChoicePoint and the Nix Building, nor would there ever be a for a dispute like Mr. Chakejian's where the court record is on PACER. DeGrace Dep. at 83. It is also undisputed that no one from the Nix Federal Building "reviewed" any information regarding Mr. Chakejian's dispute, "conducted an investigation" regarding his dispute and/or reported results back to Equifax, contrary to what the Letter represents. The Letter was simply a series of gross and reckless misrepresentations.

As was the case with Mr. Chakejian's March 4, 2007 dispute when it finally deleted the bankruptcy record, it is also undisputed that even when Equifax decides to delete a public record from a consumer's credit report on its own, and without any contact with ChoicePoint, it will still send the consumer a letter falsely indicating that it contacted the courthouse, and that the courthouse investigated the dispute. *See* Ex. G, Fluellen Dep. at 78-79;

As part of the standardized process, ChoicePoint electronically notifies Equifax as to whether disputed item should be verified, modified or deleted. *Id*. at pp. 67-68. Equifax then sends the consumer the standardized form Letter that it sent to Mr. Chakejian on January 26, 2008. *Id.* at p. 64. Equifax never notifies the consumer of the identity or contact information of ChoicePoint as required by the FCRA. *Id.*. at pp. 36, 44.

### 4. <u>Mr. Chakejian's experience is typical of Class members experiences.</u>

Mr. Chakejian's experience was typical of that experienced by Class members. Following his dispute of the inaccurate bankruptcy record, Equifax sent him the standardized form Letter it uses in such situations. Fluellen Dep. at pp. 32-35. The language contained in the

Letter was standard language that Equifax uses with all consumers. *Id.*. The process that was followed in connection with Mr. Chakejian's dispute was the "normal" process that Equifax follows. Ex. G, Fluellen Dep. at pp. 73-74.

> **5.** **As a matter of its usual procedure, Equifax sends a description of its reinvestigation procedures along with results its reinvestigation.**

As one of its main arguments supporting its summary judgment motion, Equifax contends that Plaintiff did not request a description of Equifax's investigation procedures. Def. Mem. at 1, 17-19. While this is factually wrong as set forth below (as Mr. Chakejian did make such a request), it is also odd due to the fact that Equifax admits that it sends consumers a description of its purported investigation procedures along with the results of its supposed reinvestigation in response to a dispute. Def. Mem. at 8.  This position is consistent with the testimony of Equifax's corporate representative Ms. Fluellen who testified that, in response to a consumer dispute, Equifax sends one correspondence with all of the data that it is lawfully obligated to disclose about the results of its investigation and the process that was followed. *See* Ex. G, Fluellen Dep. at pp. 29-32; 76.  Even if a consumer calls or writes to obtain a description of its procedures, Equifax would refer that consumer back to original Letter that Mr. Chakejian received. *Id*.  Equifax believes that the Letter Mr. Chakejian received described its procedures.

> **6.** **Equifax continues to use the Letter to this day.**

Another fact that is not in dispute is that Equifax continues to use the same form Letter to date when responding to a public records dispute. Fluellen Dep. at p. 64, ll. 3-7; *see also* testimony generally at pp. 58, 62-64.

B.   **Disputed Facts**

   1.   **Mr. Chakejian did request information about Equifax's investigation methods and/or procedures.**

Contrary to Equifax's assertions to the contrary (Def. Mem. at 1, 19-20), Mr. Chakejian testified that he did request information regarding Equifax's methods and/procedures for investigating public records disputes.  Mr. Chakejian testified that in connection with the Letter he received, and Equifax's purported verification of the bankruptcy, he asked Equifax's representative over the phone "who did you [speak] to" or "check[ed] with" when there was a "court order" supporting his dispute; he also asked Equifax to "Help me understand the process so I can help myself."   Chakejian Dep. at p. 89, l. 10-22, pp. 91, ll.4-17, 92, ll.5-19. Mr. Chakejian even specifically requested what Equifax's investigation "methods" were, but was told that the information was confidential:

       2  BY MR. PERLING:
       3   Q.      You don't know what Equifax did in
       4  their investigation, do you?
       5   A.      I don't.  *I mean I asked them on the*
       6  *phone the methods* and I was told that they go
       7  directly, however, it's top secret and they could not
       8  share that with me.
       9   Q.      They used that term, it's top secret?
      10   A.      Something to that effect.  That
      11  certainly was my view of what they said.
      12   Q.      So you can't say that anybody at
      13  Equifax ever used that exact term top secret?
      14   A.      Well, top secret.  They -- they -- what
      15  I can say for certainty is -- sir?
      16   Q.      Yes, sir.
      17   A.      They didn't tell me how, they didn't
      18  tell when and they told me that it was confidential.
      19   Q.      They told you their process was
      20  confidential?
      21   A.      They told me -- well, this is after the
      22  process had failed, because I knew I had a court
      23  order and they had endeavored on that process and it
      24  didn't work.  So I, again, for the second time, *as I*

13

> 25  *asked that precedingly*, for some surety that this --
> 1  this would end, this problem and pain.  And the
> 2  second time the same thing, we'll not tell you how,
> 3  it's confidential.  I said but you did it and it
> 4  didn't work, tell me how.

Chakejian Dep. at pp. 93-94 (emphasis added).

## 2.  ChoicePoint's role as a furnisher of information under the FCRA

Contrary to Equifax's repeated claims, Plaintiff has reliable evidence that the ChoicePoint operated as a furnisher of information under the FCRA.  The very best evidence of this comes from the testimony of ChoicePoint itself.

In other litigation brought against it, ChoicePoint's Rule 30(b)(6) corporate representative has repeatedly testified that ChoicePoint is a furnisher of information under the FCRA, and regulated as such.  Specifically, in 2007, in connection with the case of *Bradley v. ChoicePoint, Inc. et al*., C.A. No. 07-1255 (E.D. Pa.), pending at about the same time of the events surrounding the Chakejian dispute, Mr. Klaer testified that not only was ChoicePoint was a furnisher of information under the FCRA, it had policies and procedures to comply with FCRA:

> 54
>
> 24   Q   (BY MR. SOUMILAS) It did have procedures
> 25  under the Fair Credit Reporting Act as a furnisher
> 55
> 1  of credit information, correct?
> 2   A   Yes.

_____

> 72
>
> 2   Q   (BY MR. SOUMILAS) Okay.  What information
>
> 3  do you know about area No. 7?
> 4   A   *That as a furnisher of information we have*
> 5  *to provide accurate information.*  If it's disputed

14

6    we need to go verify it and respond and update it if
7    appropriate.
8        Q    Okay.  How did you learn that information?
9           MR. SENSENIG:  Object to the form.
10          THE WITNESS:  I may have held, I think I
11      was involved in the creation of the furnisher
12      of information document that we send to
13      independent contractors.

*See* Deposition of Andy W. Klaer in taken in *Bradley* on November 14, 2007, at pp. 54-55, 72-

73, attached to Plaintiff's Appendix of Exhibits as Exhibit I.    Mr. Klaer did not suffer a

momentary lapse of reason by so testifying in *Bradley*.   In another case venued in the Northern

District of Georgia, *Pires v. ChoicePoint, Inc. et al.*, C.A. 07-3112 (N.D. Ga.), he testified in

identical fashion regarding ChoicePoint's role as a furnisher, and testifying that ChoicePoint

holds itself out as a furnisher of information, and even has published compliance procedure

manuals to that effect:

21
14   Q    Now, ChoicePoint considered itself and
15   functioned as a furnisher of credit information with
16   respect to the public records part of the business,
17   correct?
18      A   Yes.
19      Q    And it put some procedures and manuals
20   together to comply with the Fair Credit Reporting
21   Act as a furnisher, correct?
22      A   Yes.


49
21   Q   (BY MR. SOUMILAS) Now, am I correct,
22   Mr. Klaer, that part of this guide, in fact, Bates
23   24, the first page of the guide, talks about
24   responsibilities under the Fair Credit Reporting
25   Act?

50
1       A   Which page are you on, sir?
2       Q   This is Bates 24.
3       A   Okay.  Yes.
4   Q   Guide itself.  *Am I correct that*

15

> *5   ChoicePoint, in disseminating this guide, holds*
> *6   itself out as a furnisher of credit information?*
> *7      A   ChoicePoint considers itself a furnisher*
> *8   of information.*
> *9      Q   Is it a furnisher of information under the*
> *10   FCRA, the Fair Credit Reporting Act?*
> *11      A   Yes.*

*See* Deposition of Andy Klaer in *Pires* taken on June 10th, 2008, at pp. 21-22, 49-50, attached to

Plaintiff's Appendix as Exhibit J.

However, for whatever reason, in connection with testifying in this litigation, and after

speaking with counsel, Mr. Klaer, recanted all of his previous testimony and completely

contradicted the positions he had taken previously regarding ChoicePoint's role as a furnisher.

*See* Deposition of Andy Klaer taken on August 1, 2008 in this case, at pp. 16-18, attached to

Plaintiff's Appendix of Exhibits as Exhibit K.    Clearly, the credibility of ChoicePoint and the

question of whether it functioned as a furnisher is disputed.

> **3.    Equifax knowingly made numerous and material misrepresentations regarding the results of its reinvestigation and a description of its investigation procedures when it sent the Letter.**

As set forth in Section III.A.1-3 above, the Letter that Equifax sent to Mr. Chakejian and

the Class, and which it continues to use to this day, contains numerous representations that

Equifax knows are flatly false.

Equifax represented that the source of Mr. Chakejian's bankruptcy information was the

Nix Federal Building, when it was not; instead, it was ChoicePoint.  Equifax represented that it

(or even assuming *arguendo* in the most favorable light to Equifax it was referring to

ChoicePoint) contacted the Nix Federal Building "directly", when it admits no one ever

contacted the courthouse, including ChoicePoint. It represented that it "verified" the accuracy of

the erroneous bankruptcy with the Nix Federal Building, when it did not, and does not even know if anyone from ChoicePoint did anything at all to investigate Mr. Chakejian's dispute.

Perhaps most troubling, Equifax misrepresented that the Nix Federal Building reviewed information concerning Mr. Chakejian's dispute that Equifax provided to it, that it (*i.e.* the Building) conducted an investigation, and reported the investigation results back to Equifax, when it did not, and when it knows that courthouses *never* participate in any Equifax investigation. Equifax also misrepresented that if Mr. Chakejian had further dispute or questions he should take up his dispute with the Nix Building, when it knew that no one from the bankruptcy court had any involvement with his dispute. Since it is undisputed that Equifax never had any contact with the Nix Federal Building, or any courthouse for that matter, such misrepresentations cannot be realistically as anything other than knowing misrepresentations and deceptions--the precise kind of "trickery" Mr. Chakejian testified about.

### 4. Equifax had a history of notice and awareness that the Letter was deceptive and misleading.

While the misrepresentations it made alone would suffice as evidence of reckless or knowing conduct under the FCRA, the evidence regarding Equifax's *scienter* is more comprehensive. Evidence of record demonstrates that Equifax had a history of awareness that the Letter was generally deceptive and misleading, and created the mistaken impression that a courthouse was involved when a consumer disputed a public record with Equifax. Equifax's repeated contentions in its Motion that it had no notice that its Letter was deceptive is simply untrue.

At her deposition in the parallel New Jersey class action, *Summerfield*, Equifax's corporate representative Ms. DeGrace admitted that the Letter could mislead consumers into believing that a courthouse was conducting some type of investigation:

17

3      Q   (BY MR. SOUMILAS) And how about the
4  other language that we spoke about that talked
5  about under the notice to consumers that the
6  source reviewed the information provided and
7  conducts an investigation, *do you think that that*
8  *could mislead consumers into believing that the*
9  *courthouse actually conducted some type of an*
10  *investigation?*
11          MR. PERLING:  Objection to form.  Calls
12      for a legal conclusion.  Calls for an opinion.
13      Addresses the ultimate issue in the case.  I
14      don't think this witness is qualified to
15      testify to that.

16          THE WITNESS:  *I agree.*

17      Q   (BY MR. SOUMILAS) So you don't have any
18  opinion on that, ma'am?
19      A   *I agree.*

*See* Deposition of Shawn DeGrace taken on January 12, 2009 in *Summerfield v. Equifax Information Services,* at pp. 88, attached to Plaintiff's Appendix of Exhibits as Exhibit L (emphasis added).

This was not the first time Ms. DeGrace expressed knowledge by Equifax of the misleading nature of Equifax's Letter or was confronted with the fact that it contained falsehoods.  During the trial of another matter against Equifax in 2006, *Abusaab v. Equifax Information Services*, C.A. 05-5094 (E.D. Pa.), plaintiff's counsel asked questions about the same form Letter.  In that case, the plaintiff Shadee Abusaab had made disputes to Equifax regarding an erroneously reported judgment reported against him on his Equifax credit report arising from a personal injury suit. In response to his disputes, Equifax sent him the same form Letter on two different occasions in which it claimed that it had contacted the courthouse in that case (Philadelphia City Hall) when it had not.

When confronted on cross-examination, Ms. DeGrace was forced to concede that Equifax's representations regarding its purported contacts and communications with City Hall were false. She further testified that Equifax was "glad" that the Letter's false nature was brought its attention, and that Equifax was rewriting the Letter because Equifax "agree[d]" with the plaintiff's counsel that the letter was "not clear":

> 17. Q.     Below are the results of your request for Equifax to
> 18. reinvestigate certain elements of your Equifax credit file,
> 19. Equifax *contacted each source directly* and our investigation
> 20. is complete. That's false, isn't it?
> 21. A.     That is incorrect. *Yes, that's incorrect.* We did not.
> 22 We accepted the documentation.
> 23. Q.     Equifax did not contact any source directly or
> 24. indirectly?
> 25. A.     In this particular case, that is correct.
> 1. Q.     In both of these particular occasions. In June and in
> 2. July?
> 3. A.     That is correct.
> 4. Q.     *So that statement was false?*
> 5. A.     It's a form letter. It's for consistency purposes.
> 6. Q.     *Was it true?*
> 7. A.     *It's not, in this case.* We accepted documentation,
> 8. which we go on to explain further in the letter.
> 9. Q.     It's false in the case of Mr. Abusaab?
> 10. A.     We accepted documentation, you're correct.
> 11. Q.     Now, looking at the second page of these letters, again,
> 12. this is form text, that's why it goes out to everybody,
> 13. right?
> 14. A.     Correct.
> 15. Q.     *Do these letters still go out today?*
> 16. A.     *We are actually in the process of re-writing these*
> 17. *letters. We are re-writing that first paragraph because we*
> 18. *agree with you.* We don't sometimes we accept the documents
> 19. and we need to be more clear about that. But we send out
> 20. thousands of letters. We need a consistency and that's what
> 21. this is all about. *That's why the form letter says what it*
> 22. *says. It's for consistency. And we agree it's not clear and*
> 23. *we're very glad you brought that to our attention because no*
> 24. *one had ever brought that to our attention until you did.*
> 25. Q.     Now, let me follow up on that point. No one had brought
> 1. it to your attention. How would a consumer possibly know
> 2. that Equifax did not go to the courthouse?

19

• • •

10. Q.      Look at the bottom text, ma'am, of the first paragraph.
11. A.      Okay, where would you like me to start?
12. Q.      The name, address, and if reasonably available the
13. telephone number of the furnishers of the information
14. contacted while processing your dispute is shown under the
15. results of your investigation section of the cover letter.
16. Do you see that?
17. A.      Yes.
18. Q.      What is that referring to in the case of Mr. Abusaab?
19. What is the contact information under results of
20. investigation?
21. A.      It's referring to where the information is filed.  The
22. source of the information.
23. Q.      Philadelphia City Court, Broad and Market Street.
24. A.      Correct.
25. Q.      *Nobody contacted the Philadelphia City Court at Broad*
1. *and Market Street.*
2. A.      *In these two investigations, no.*
3. Q.      And there is no way that a consumer would know just by
4. reading this letter that Equifax didn't do what it said it
5. did.
6. A.      I agree.  *I think we need to be more clear.*
7. Q.      So, how would a consumer complaint to Equifax if they
8. don't go and take a deposition and figure out what's going
9. on?
10. A.      *Well, I'm very glad you brought it to our attention now.*

*See* testimony of Shawn DeGrace given in *Abusaab v. Equifax Information Services*, C.A. 05-

5094 (E.D. Pa.) on May 17th, 2006, at pp. 119-122, attached to Plaintiff's Appendix of Exhibits

as Exhibit M.  As such, as early as Spring of 2006, Equifax knew that the Letter contained

multiple misrepresentations and the false impression that Equifax communicates with

courthouses when a consumer disputes a public record error appearing on his or her Equifax

credit report. Despite Ms. DeGrace's testimony in *Abusaab* and *Summerfield*, Equifax continues

to use the Letter today, and neither she nor Ms. Fluellen nor any Equifax witness knows anything about the Letter being rewritten. *See* Ex. G, Fluellen Dep. at pp. 57-58.

The record is also clear that Equifax knew that it was important for its Letter be truthful and clear, and that consumers be given the true information regarding the true source of a public record being reported about them.  Equifax's corporate representative testified that credit reports mistakes relating to public records can and do occur, not necessarily because a courthouse does something wrong, but because ChoicePoint takes an otherwise accurate public record and incorrectly summarizes it or misreports it to Equifax (what Equifax terms a mistake at the "vendor level").  Ex. G, Fluellen Dep. at 49-50.  Thus, in such a situation as Mr. Chakejian's, the courthouse will be of no assistance to the consumer because it is reporting the correct information all along.  Equifax was thus fully aware that in cases of vendor level errors, its Letter would unnecessarily cause consumers to run to courthouses in futility to dispute an error caused by a private company they were never told about.

> ### 5.    Expert opinion of Evan Hendricks and the *Apodaca* case—additional evidence regarding Equifax's *scienter*.

Plaintiff has engaged an expert witness, Evan Hendricks, to provide an expert report in connection with this case.  Mr. Hendricks' report on Equifax's practice, which includes his qualifications, a list of prior cases in which he has testified, and more general opinions, is attached hereto as Exhibit N.

Mr. Hendricks is an acknowledged expert on the credit reporting industry.  *Kirkpatrick v. Equifax*, No. CV-02-1197 (D. Or. Jan. 18, 2005) (quoted in Exhibit N, n. 1) (finding Mr. Hendricks' testimony helpful to jury).  With respect to the Letter, Mr. Hendricks has specifically opined as follows:

**Equifax's Form Letter**

Equifax's form letter tells consumers that if their dispute requires further investigation, then "notification of your dispute, including the relevant information you submitted, is provided to the source that furnished that disputed information."

While this might basically be true for creditors using Metro 2 and E-OSCAR, it is patently false when it comes to the courts. First of all, courts do not ***furnish*** information to Equifax. Instead, the vendor, CP/LN ***gathers*** the information from the courts, which maintain data in a variety of formats. It is CP/LN that actually ***furnishes*** the information to Equifax.

Equifax's form letter next tells the consumer that it has "reviewed the bankruptcy information" and has "verified" that the information belongs to him, and that the source of the information is the court. It continues:

> If you have additional questions regarding the information provided to Equifax by the source of any information, please contact the source of that information.

Again, Equifax's description is basically correct for the standardized Metro 2 and EOSCAR systems used by creditors, but it is incorrect and therefore misleading for court information. For starters, Equifax's letter wrongly couples the primary source of the information, the court, with the entity that actually furnished the information, CP/LN.

By stating that Equifax has contacted the source, and that the source "reviews the information provided, conducts an investigation with respect to the disputed information and reports the results back to us," Equifax misleads the consumer in several important ways.

First, Equifax falsely gives the impression that the a court, an arm of the government responsible for arbitrating important disputes, had investigated the veracity of the information appearing on the consumer's Equifax report. Of course, the court did no such thing. And given the vital role of the courts, this is profoundly misleading.

Second, it misleads consumers into believing that they can remedy the matter by taking it up with the court. If the issue is a mistake with the court record, and the consumer corrects that mistake, it still is not going to correct Equifax's records because the court is not furnishing the information to Equifax or otherwise communicating with it. Worse, if the record is accurate but concerns a different individual, taking it up with the court won't resolve anything for the victim of the inaccuracy.

22

Equifax testified that it doesn't contact the source directly (DeGrace, pg. 66 – Summerfield). Importantly, the court, which its letter represents as the "source," and which Equifax confirmed as the source in its testimony (*Id.*, 63), does not conduct an investigation (*Id.*, 66-67). Equifax also directs the consumer who is not satisfied with the investigation of his dispute or who has questions to contact the "source," and then lists the court as the source. Equifax does this even though it knows that the court did not conduct the investigation and knows because of this that contacting the court is not reasonably calculated to resolving the consumer's dissatisfaction with or questions about the investigation. Thus, under oath, Equifax testified truthfully that key assertions in its letter, the ones the consumer is most likely to rely and act upon, are inaccurate. Given the profound importance of credit report accuracy, and the fact that data from court records is highly damaging, these inaccuracies are egregiously misleading, in my opinion.

The form letter is also unfair and potentially misleading in making the consumer believe that the burden is on him to conduct a true investigation. Equifax should know this from the case of Vicki Apodaca. After Equifax had wrongly mixed another Ms. Apodaca's bankruptcy into her file, Mrs. Apodaca had to drive a considerable distance to the court where the bankruptcy record resided. Of course she was unable to make any correction there. Sending a copy of the other Apodaca's certified bankruptcy also failed to convince Equifax to delete the erroneous information from Mrs. Apodaca's file. It was only corrected after she filed an FCRA lawsuit. (*Apodaca v. Discover Financial Services, et al.*, 417 F.Supp.2d 1220, D.N.M. 2006.)

Thus, Equifax's deceptive form letter has negative implications for consumers.

Exhibit N at pp. 4-5 (emphasis in original).

Mr. Hendricks opines that Equifax has financial incentives to use the same form Letter for distinct types of records. It is faster, cheaper and easier, as testified to by Equifax's own witness. Exhibit N at 5-6. Mr. Hendricks disagrees that Equifax's reasons for using the same form Letter for a variety of different consumer circumstances is a justification for failing to create an accurate form letter for public records disputes. He points out how simple it would be for Equifax to change the form letter: "It would be neither difficult nor time-consuming for Equifax to create an accurate form letter for the distinct category of disputes involving court records, in my opinion. But Equifax has not done so, even though it is keenly aware of the

damaging nature of court record data to a consumer's creditworthiness. Therefore, Equifax's failure to do so is reckless, in my opinion." *Id*. at 5-6.

Mr. Hendricks also opines that Equifax has been on notice for many years that there is a history of significant inaccuracy rates in credit reporting data. *Id*. at 12-15. Included in that history are a series of consent agreements between the Federal Trade Commission and State Attorneys General on one side, and CRAs such as Equifax on the other, whereby the CRAs agreed to cease and desist from a variety of practices that included inaccurate reporting of public records data. *Id*. at 14. The consent agreements resulted in widespread publicity about the problems of credit report inaccuracy, set forth an agreed upon higher and more specific standard of car to ensure accuracy and fairness, and formed the foundation for the 1996 amendments to the FCRA. *Id*. The amendments noted the need for federal legislation to improve accuracy-related protections for consumers. *Id*. at 15.

Thus, as Mr. Hendricks concludes, since the early 1990s:

Equifax was on notice from Congress, the FTC, State AGs, and the public that there were serious shortcomings in their routine practices for producing credit reports, reinvestigating, preventing reappearance of previously deleted data and being responsive to consumers' disputes. Equifax was also on notice that these shortcomings caused damage to consumers. The expectation of Congress, the FTC, State AGs, and the public was that Equifax would improve its procedures and practices for ensuring accuracy, adequately reinvestigating, preventing reappearance and being more responsive to consumers, in my opinion.

Exhibit N, at 15.[8]

---

[8] In its Motion, Equifax takes Mr. Hendrick's use of the term "first impression" at his deposition out of context and mischaracterizes the significance of his opinions. Def. Mem. at p.1. Mr. Hendrick's use of the term was meant only to confirm that there is no appellate decision or FTC regulation specifically related to the misleading communications in the Letter at issue. Equifax, however, hardly needs Mr. Hendricks' or the FTC's guidance (it ceased giving opinion letters years ago) to understand that its FCRA mandated disclosures should be truthful. Moreover, Equifax ignores the more pertinent facts underlying Mr. Hendrick's opinions, that

## IV.   <u>APPLICABLE STANDARDS</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997).  A fact is "material" if the dispute "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the non-moving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The non-moving party cannot rely upon "bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982).

The threshold inquiry at the summary judgment stage involves determining whether there is the need for a trial, that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 250-52.

In the case at bar, there exist genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.  Summary judgment, therefore, is inappropriate.

---

Equifax continued to publish the Letter at issue despite its cognizance that the letter was misleading to consumers and its purported intention to rewriting the letter a number of years ago.

## V.   **ARGUMENT**

While Equifax's motion is primarily directed toward challenging the willfulness allegations of Plaintiff's Amended Complaint, it also raises challenges to the basic elements for the underlying cause of action that Plaintiff has asserted.  Equifax's motion fails on both fronts.

### A.     **There is A Genuine Issue of Material Fact Whether Equifax Violated Sections 1681i(a)(6)(A) and 1681i(a)(6)(B) of the FCRA by Sending the Letter**

Plaintiff's claim in this case arises under section 1681i of the FCRA, a section which embraces numerous responsibilities of a consumer reporting agency ("CRA").  At issue here are two duties following a CRA's receipt of a consumer's dispute of a credit report error, namely: 1) the duty to provide the consumer with "written notice…of the results of a reinvestigation" and 2) the duty to provide a description of the procedure used to determine the accuracy and completeness of the information," which includes the name and telephone number of the any information furnisher (person or entity who provided information) whom it contacted in connection with the dispute. Amend. Compl. (Doc. 2), ¶¶ 28 and 29.  The specific statutory language is set forth at 15 U.S.C. §1681i(a)(6)(A) and §1681i(a)(6)(B)(iii).  The text reads in pertinent part:

> 6) Notice of results of reinvestigation.--
>
> (A) In general.--A consumer reporting agency shall provide written notice to a consumer of the ***results of a reinvestigation*** under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.
>
> (B) Contents.--As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5-day period referred to in subparagraph (A)--
>
> *******
>
> (iii) a notice that, if requested by the consumer, ***a description of the procedure used to determine the accuracy and completeness of the information shall be***

> ***provided to the consumer by the agency***, ***including the business name and address of any furnisher of information contacted*** in connection with such information and the telephone number of such furnisher, if reasonably available;

15 U.S.C. § 1681i(a)(6) (emphasis supplied).   These duties are part of a broader array of disclosure-oriented obligations that the FCRA imposes on CRAs which strive to make the credit reporting process more transparent for consumers and reduce credit errors by allowing consumers the right to correct and inspect the credit data being sold about them.  *See, e.g.*, 15 U.S.C. § 1681g (FCRA section giving consumers the right to obtain all information a CRA reports about them); *Gillespie v. Equifax Info. Servs., LLC*, 2008 WL 4316950, *6 (N.D. Ill. Sept. 15, 2008) (very same defendant Equifax denied summary judgment for failing to provide consumer with all information in its file).[9]

Equifax does not contest the existence of these two duties.  As acknowledged by Equifax's own corporate representative Alicia Fluellen, Equifax has a duty under the FCRA to provide certain free information to consumers. *See* Exhibit G, Fluellen Dep. at p. 27. As part of its consumer disclosure duties, Equifax is required to provide certain free information to a

---

[9]   Section 1681g states that a CRA is required to provide a consumer with the following information:

> (i) the right of a consumer to obtain a copy of a consumer report under subsection (a) of this section from each consumer reporting agency;
> (ii) the frequency and circumstances under which a consumer is entitled to receive a consumer report without charge under section 1681j of this title;
> (iii) the right of a consumer to dispute information in the file of the consumer under section 1681i of this title;
> (iv) the right of a consumer to obtain a credit score from a consumer reporting agency, and a description of how to obtain a credit score;
> (v) the method by which a consumer can contact, and obtain a consumer report from, a consumer reporting agency without charge, as provided in the regulations of the Commission prescribed under section 211(c) of the Fair and Accurate Credit Transactions Act of 2003; and
> (vi) the method by which a consumer can contact, and obtain a consumer report from, a consumer reporting agency described in section 1681a(w) of this title, as provided in the regulations of the Commission prescribed under section 1681j(a)(1)(C) of this title.

15 U.S.C. § 1681g(c).

consumer following a dispute.  *Id*. at p. 28. This includes information both pertaining to the

results of the investigation and the notice which describes the investigation process and/methods:

```
14  Q   Now, when it comes to disputes and a
15  consumer makes a dispute about a public record, am I
16  correct that Equifax will respond to that consumer
17  in writing?
18    A   Yes.
19    Q   And that communication will also provide
20  information about the results of the investigation,
21  correct?
22    A   Yes.
23    Q   And that is, again, for free provided to
24  the consumer?
25    A   Yes.
                         29
 1    Q   What type of information does Equifax
 2  provide according to its duties under the Fair
 3  Credit Reporting Act at the end of an investigation
 4  of public records?
 5      MR. PERLING:  Objection to form.  Calls
 6    for a legal conclusion.  You can still answer.
 7      THE WITNESS:  Without looking at the
 8    packet of information, we provide the summary
 9    rights; we provide the notice to the consumer
10    which explains the reinvestigation process and
11    any state notices that would be applicable to
12    that consumer.
```

*Id*. at pp. 28-29.  Technically, as for Equifax's second duty (*i.e*., the duty to provide a description

of the procedure Equifax used to "determine the accuracy and completeness" of the disputed

information, which includes the name and number of the information furnisher found at

§1681i(a)(6)(B)(iii)), Equifax could require a separate request from a consumer after sending its

reinvestigation results before being obligated to comply.  However, it has chosen not to.  Instead,

Equifax sends a disputing consumer "one package," which it asserts contains *both* the results of

its reinvestigation and a description of its reinvestigation process, including the sources of

information and/or furnishers of information.  *See* Ex. G, Fluellen Dep. at pp. 29-32.  The

January 26, 2007 Letter that Equifax sent to Mr. Chakejian is an example of Equifax's combined disclosure.  *Id*. at p. 33.

> **1. Equifax violated FCRA section 1681i(a)(6)(A) when it failed to provide Plaintiff with the truthful and accurate results of its reinvestigation of his credit report dispute.**

As discussed above in Section III A and B above, following his dispute of the erroneously reported bankruptcy, Equifax sent Mr. Chakejian the January 26, 2007 Letter in which it made numerous misrepresentations relating to whom it contacted in connection with its investigation of his dispute, what it did, and what the Nix Federal Building did.

Specifically, as for the results of its supposed reinvestigation, Equifax represented that it "verified that th[e] [banktruptcy] belong[ed]" to [Mr. Chakejian]" after contacting the Nix Federal Building "directly."   That is entirely false.   As documented above, Equifax never contacted the Nix Federal Building, much less directly or indirectly, and never verified that the bankruptcy belonged to Mr. Chakejian.   The only thing Equifax did was send an electronic notification to ChoicePoint with a tiny fraction of the data that Mr. Chakejian provided to Equifax. *See* Exhibit H.

Moreover, no one even from ChoicePoint contacted the Nix Building, or any person at the Eastern District of Pennsylvania for that matter, in connection with Mr. Chakejian's dispute. For Equifax to state that the results of its reinvestigation were a verification of the bankruptcy record with the "NIX Federal Buil, 900 Market St RM 400" cannot be viewed as anything other than an unmitigated lie.   Truthful reinvestigation results would have been a statement that after sending a notification to a third party company ChoicePoint, Equifax received a notice back that it said that ChoicePoint claimed that the information was accurate.   As such, a reasonable jury

could find that Equifax violated the FCRA by failing to provide Mr. Chakejian with written notice of the results of its reinvestigation of his dispute.[10]

### 2.  Equifax's motion offers no challenge to Plaintiff's section 1681i(a)(6)(A) claim.

However, there is another more basic reason that the Court should deny summary judgment as to Plaintiff's claim that Equifax failed to provide written notice of the results of its reinvestigation: Equifax has not raised it.  Equifax's Motion is directed solely toward arguments why a section 1681i(a)(6)(B)(iii) claim (discussed below) should not withstand summary judgment and why there is no evidence of willfulness.  Equifax has never once asserted that it adequately provided the results of its reinvestigation of Mr. Chakejian's dispute.

While Equifax's arguments as to Plaintiff's asserted violation of FCRA section 1681i(a)(6)(B)(iii) fail specifically for the reasons discussed below, Plaintiff notes as an initial matter, that none of Equifax's arguments —whether Plaintiff made a request for its investigation procedures, whether it was required to disclose ChoicePoint as an information furnisher, and whether its failure to do so was willful —have any bearing on its failure to properly disclose the results of its reinvestigations.

As such, summary judgment is not even before the Court on Plaintiff's claim that Equifax violated section 1681i(a)(6)(A).

### 3.  Equifax violated FCRA section 1681i(a)(6)(B)(iii) by misrepresenting the procedures it followed and the parties it contacted to verify the accuracy of the erroneously reported bankruptcy.

Any reasonable interpretation of the January 26, 2007 Letter Equifax sent to Mr. Chakejian confirms that Equifax's violated FCRA section 1681i(a)(6)(B)(iii).

---

[10]     Equifax cites *Baker v. Capital One Bank*, 2006 WL 2523440, *10 (D. Ariz. Aug. 29, 2006) to support its argument that the disclosures it provides are compliant, but that case is totally unhelpful.  As the court in that case found, the plaintiff's claim in that case was generic and conclusory, and supported by no evidence whatsoever that Equifax's disclosures were non-compliant.

In its January 26, 2007 Letter, Equifax described its procedure for investigating Mr. Chakejian's dispute as follows:

1. It contacted the source of the disputed bankruptcy record "directly", with that source being the Nix Federal Courthouse,
2. Equifax provided "notification" of Mr. Chakejian's dispute to the Nix Federal Building;
3. That it provided the "relevant information" that Mr. Chakejian provided Equifax to the Nix Federal Building;
4. The Nix Federal Building conducted a review and investigation of Mr. Chakejian's dispute;
5. The Nix Federal Building reported back to Equifax with the results of its investigation.

*See* Letter, at Exhibit E. As laid out in detail in Sections III.A.2-3 and B.3. above, none of these statements were true, and Equifax never provided to Mr. Chakejian a truthful or accurate description of its investigation procedures. This evidence alone would be enough to present a genuine issue of material fact that Equifax violated FCRA section 1681i(a)(6)(B)(iii), but the evidence supporting Plaintiff's claim is more comprehensive.

### a.      Equifax's failure to disclose ChoicePoint as a furnisher of information

The factual record is clear that the only source or furnisher for Equifax's public records information during the time in question was ChoicePoint. *See* section III.A.3 and III B.2, above. It is equally undisputed that ChoicePoint is the only entity Equifax contacted in connection with Mr. Chakejian's dispute. *Id.* Thus, the fact that Equifax failed to disclose the name, address and telephone number of ChoicePoint is further evidence that it violated FCRA section 1681i(a)(6)(iii) when it sent Mr. Chakejian the Letter. *See* 15 U.S.C. §1681i(a)(6)(iii).

Equifax spends a considerable part of its Memorandum attempting to persuade the Court that ChoicePoint, as its supposed public records vendor, is not and cannot be considered a

"furnisher of information" under the FCRA.   Such an argument is without support, and at a minimum, is a contested issue of fact.

First, the FCRA's text does not support Equifax's argument. The FCRA provides no definition for the term furnisher of information.  As such, it must be given its ordinary and usual meaning.   According to *Webster's II New Riverside Universal Dictionary* "furnish" means "to supply: give."   Thus, any person or company who furnishes information to Equifax may constitute a furnisher of information.   In addition, in no place does the FCRA explicitly or implicitly exclude companies which sell public records information from its duties. If anything, such companies may be constitute CRAs themselves, as ChoicePoint as has been found.  *See* cases cited, footnote 7, *supra*.

Second, and more importantly, there is persuasive evidence that ChoicePoint is a furnisher of information, has held itself out as one and that Equifax was aware of that fact.   As laid out in Section III.B.2 above, ChoicePoint's own corporate representative, in connection with FCRA litigation brought against *it*, has admitted under oath that it is a furnisher of information, and actually maintained policies and procedures to comply with the FCRA as a furnisher of information.  *See* Exs. I and J, Klaer testimony.

Equifax correctly points out that when Mr. Klaer was deposed in this case, after a discussion with counsel, he decided to recant all of his previous testimony, and take the position that he did believe that ChoicePoint was a furnisher.  *See* Ex. K, Klaer testimony.  Clearly such a significant departure from previous testimony by a professional witness on a highly disputed issue creates a credibility issue that is not appropriate for resolution through summary judgment.

Certainly, if a large public corporation like ChoicePoint itself believed that it was regulated under the FCRA as a furnisher of information, it would be reasonable for a jury to infer

that that the company it contracted with for the purpose of obtaining FCRA-covered data such as public records (i.e. Equifax) was aware of that fact.

But Plaintiff is not asking this Court to rely upon speculation.   The fact is that Equifax itself viewed ChoicePoint as performing the role of FCRA furnisher.   Equifax argues that this Court should not consider ChoicePoint to be a furnisher because as a public records vendor, it did not play the role or perform the types of tasks of typical furnishers, like lenders and banks, who are responsible for performing investigations of consumer disputes when Equifax notifies them of a consumer's dispute.  *See* Def. Mem at pp. 20-22.  However, that is precisely the task that Equifax designated to ChoicePoint when it contracted for ChoicePoint to be its exclusive supplier of public records data.

As Plaintiff has learned, not only did Equifax enter into an agreement whereby it agreed to purchase public records data from ChoicePoint, it contracted with ChoicePoint for it to perform the investigations of a consumer's dispute, just as a traditional, such as a bank or other lender is required to perform under section 1681s-2 under the FCRA.  *See* Public Records Agreement between Equifax and ChoicePoint, dated October 7, 2002, attached hereto as Exhibit O (filed under seal)[11].   Pursuant to its contract with Equifax, ChoicePoint was required to perform investigations of consumer disputes, just like a furnisher of information is under the FCRA.  *See* 15 U.S.C. § 1681s-2; *see* also *Evantash v. G.E. Capital Mortgage Servs., Inc.*, Civ. No. 02-1188, 2003 WL 22844198, (E.D. Pa. Nov. 25, 2003).[12]

---

[11]     As the Court will see, the Agreement names National Data Retrieval ("NDR") as the party contracting with Equifax.  NDR had been acquired and owned by ChoicePoint during the relevant time of this litigation.

[12]     To support its argument that Choicepoint is not a furnisher of information, Equifax tries to analogize it to its other vendors it uses, such as a bicycle messenger and Docufree, its mail processor. Def. Mem. at 9 and 24.  But this analogy is strained and inappropriate for the simple reason that Equifax has not designated these entities to perform non-delegable duties under the FCRA as it has with Choicepoint.

**b.** **Equifax's argument that Mr. Chakejian failed to request a description of its investigation procedures is a disingenuous red herring**

As one of its main arguments, Equifax argues that summary judgment is warranted as to Plaintiff's claim under FCRA section 1681i(a)(6)(B)(iii) because Mr. Chakejian never made a request to Equifax for a description of its investigation procedures. Given what Equifax knows about the evidentiary record, its argument can only realistically be viewed as a disingenuous red herring for two reasons.

First, Equifax is just factually wrong. As set forth in Section III.B.1, above, Mr. Chakejian clearly requested information about Equifax's "methods" and "process" for investigating his dispute of the erroneous bankruptcy Equifax was reporting about him because he found Equifax's claim that it verified the information with the Nix Federal Building as incredulous. *See* Ex. A, at pp. 89-94. His testimony is clear that he requested Equifax to describe its investigation procedure.

Second, even if Mr. Chakejian had not requested information about Equifax's investigation procedures, it would be of no moment due to the fact that Equifax never provides consumers with any additional information about its procedures than what it provides to consumers automatically following a dispute. As set forth in Sections III.A.5 and V.A., above, Equifax provides all of the FCRA information to consumers it believes that it is required to in one package following its investigation of a consumer dispute; it does not await a separate request from a consumer, and does not send more information if requested by a consumer. *See* Ex. G, Fluellen Dep. at pp. 27-33. It is uncontested that what Equifax sends consumers following an investigation of a dispute includes both of what *it* views as the required reinvestigation results required under FCRA section 1681i(a)(6)(A) and the description of its

34

investigation procedures required under FCRA section 1681i(a)(6)(B)(iii), and that the Letter it sent Mr. Chakejian is an example of what it views as satisfying both statutory obligations. *Id*. at 32-33.

As such, the essence of Equifax's argument is that consumers should have to make a redundant request for something which they have already received (and for which they would receive nothing additional) in order to have standing to bring a claim under section 1681i(a)(6)(B)(iii) claim. Such a concept squarely contradicts the FCRA, which is a remedial statute. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996); *see also Cushman v. Trans Union, LLC*, 115 F.3d 220 (3d. Cir. 1997).

## B. Equifax's Conduct Could Easily Be Deemed By A Reasonable Jury To Be Willful

Equifax claims that its conduct could not be found to be willful. To the contrary, under the facts of this case, a reasonable jury could find not only that Equifax violated the FCRA, but that it did so willfully. A willful violation allows a jury to award statutory damages of $100 to $1,000 per Class member, as well as punitive damages. 15 U.S.C. § 1681o(a)(3).

### 1. The FCRA Willfulness Legal Standards

The FCRA does not define the term "willfully" and does not give any guidance as to how a defendant "willfully fails to comply with any requirement" of the Act. *See* 15 U.S.C. §§ 1681a, 1681n. In its only discussion of the subject, the Supreme Court held that Congress intended the term "willfully" within the FCRA to have its "common law usage." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007). The Court said that the common law "treated actions in 'reckless disregard' of the law as 'willful' violations." *Id.* It thus concluded that

"[t]he standard civil usage thus counsels reading the phrase 'willfully fails to comply' in § 1681n(a) as reaching ***reckless*** FCRA violations." *Id.* (emphasis added).[13]

The Court in *Safeco* did not state that a reckless violation is the only one that can be willful under the FCRA: "If, on the other hand, 'willfully' covers both knowing and reckless disregard of the law, knowing violations are sensibly understood as a more serious subcategory of willful ones." *Id.* at 59 (*citing United States v. Menasche*, 348 U.S. 528, 538-539 (1955) ("'[G]ive effect, if possible, to every clause and word of a statute'") (*quoting Montclair v. Ramsdell*, 107 U.S. 147, 152, (1883)).

Long before *Safeco*, the Third Circuit had held ten years earlier in *Cushman,* 115 F.3d at 227 (3d Cir. 1997), that willful FCRA violations can be "knowing" ***or*** can show a "reckless disregard" for consumer rights. *Cushman* also observed that a defendant may willfully violate the FCRA by actions that are "on the same order as willful concealments or misrepresentations." *Id.*

Perhaps Congress intended "willfully" to mean other things as well, but as clarified by precedent, willful FCRA violations can be: (1) knowing; (2) reckless; or (3) on the same order as willful concealments or misrepresentations.

## 2.    FCRA Recklessness Further Defined

With respect to the lowest of these standards, "recklessness," *Safeco* observed that "[a]lthough efforts have been made to distinguish" the terms "willful," "wanton," and "reckless," "such distinctions have consistently been ignored, and the three terms have been treated as

---

[13]    Equifax relies on at least one case that erroneously applied the wrong willfulness standard. In *Perez v. Trans Union, LLC,* 526 F.Supp.2d 504, 510-511 (E.D. Pa. 2007), the court apparently relied on the plaintiff's required the plaintiff to prove that the defendant was "*consciously aware*" of an inaccuracy on the plaintiff's consumer report "and then proceeded to report the inaccuracy anyway," ruling in favor of the defendant where plaintiff "presented no evidence that [defendant] intentionally acted in conscious disregard of Plaintiff's rights…"  (Emphasis in original).  An intentional act is not the standard to be applied here.

meaning the same thing, or at least as coming out at the same legal exit." 551 U.S. at 57 (*citing* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 34, p. 212 (5th ed.1984)). The Court further noted that "[w]hile 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known *or so obvious that it should be known.*'" *Id.* at 68 (emphasis added) (*quoting Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also* PROSSER AND KEETON § 34, at 213-214.[14]

Although the Court in *Safeco* describes reckless as an "objective" standard, that finding is entirely consistent with previous Supreme Court pronouncements in similar contexts which have emphasized that "recklessness" determinations are fact-bound inquiries that must typically be answered by a jury. *See, e.g., Masson v. New Yorker Magazine, Inc*. 501 U.S. 496, 521 (1991) (in defamation cases, "the evidence creates a jury question whether [defendant] published the statements with knowledge or reckless disregard."); *Time, Inc. v. Hill*, 385 U.S. 374, 394, (1967) ("Where either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood."); *Equitable Life Ins. Co. of Iowa v.*

---

[14]    *Safeco* also cited to the RESTATEMENT (SECOND) OF TORTS, which defined recklessness with respect to a person's physical safety as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, **knowing or having reason to know** of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Safeco*, 551 U.S. at 69 (emphasis added) (*quoting* RESTATEMENT (SECOND) OF TORTS § 500, p. 587 (1963-1964)).

*Halsey, Stuart & Co.*, 312 U.S. 410, 420-21 (1941) (in fraud case, "[t]he question of respondent's recklessness was thus submitted to the jury and we think properly so.").[15]

### 3. Many Courts Have Held In FCRA Cases That The Jury Should Decide Whether A Defendant Acted With Reckless Disregard

 In applying the reckless disregard standard to the facts of FCRA cases, many courts have found that, even though recklessness is an objective *legal* standard, the question whether a particular set actions or omissions shows a "reckless disregard" of consumer rights is usually a fact-bound inquiry and thus presents a question for the jury.

The Third Circuit, for example, reversed and remanded a trial court judgment as a matter of law and instructed the trial court to consider the plaintiff's FCRA willfulness claim in light of the reckless disregard standard.  *Cushman*, 115 F.3d at 223, 227 (citing *Millstone v. O'Haleron Reports, Inc.*, 528 F.2d 829, 834 (8th Cir. 1976) (upholding FCRA willfulness finding by jury and punitive damages verdict)).

Following *Cushman*, several judges in the Eastern District of Pennsylvania have rejected motions for summary judgment by consumer reporting agencies ("CRAs") in FCRA willfulness cases, finding that the reckless disregard determination should be left for the jury.  *See Abusaab v. Equifax Info. Services, LLC*, 2006 WL 1214782, *2 (E.D. Pa. 2006) (Bartle, C.J.) (denying summary judgment to CRA for FCRA willfulness claim); *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582, 590 (E.D. Pa. 2003) (Brody, J.) (same); *Crane v. Trans Union, LLC*, 282 F. Supp.

---

[15]     The Third Circuit agrees that recklessness determinations are usually reserved for the jury.  *See Frett v. Government of Virgin Islands*,  839 F.2d 968, 978 (3d Cir. 1988) (in section 1983 case, "we have no difficulty in upholding the district court's conclusion that recklessness was a jury question."); *Healey v. Catalyst Recovery of Pennsylvania, Inc.*,  616 F.2d 641, 650 (3d Cir. 1980) (in securities action, "there was a jury question as to whether these four defendants acted recklessly"); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 146 (3d Cir. 1973) (in product liability case, "whether [defendant's conduct] would constitute a reckless indifference to the public's safety, are, we think, questions which the jury should have been allowed to pass upon.").

2d 311, 321 (E.D. Pa. 2003) (Dalzell, J.) (same); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, Civ. No. 02-1188, 2003 WL 22844198, *8 (E.D. Pa. Nov. 25, 2003) (Davis, J.) (same); *Sheffer v. Equifax Info. Solutions, Inc.*, 2003 WL 21710573, at *3 (E.D. Pa. July 24, 2003) (Schiller, J.) (same).[16]

These cases also demonstrate that the reckless disregard standard is usually a fact-bound inquiry, a concept that our Circuit recently reiterated.  *See Whitfield v. Radian Guaranty, Inc.*, 501 F.3d 262 (3d Cir. 2007).   Indeed, in *Whitfield,* the Third Circuit, in a post-*Safeco* FCRA decision, reversed a grant for summary judgment on an FCRA willfulness claim and held that the issue of willfulness was for the jury to decide.  *Id.* at 271.  The Third Circuit stated:

> We do not suggest that a factfinder could not or would not determine that [the defendant] did not act willfully.  Instead, *we hold that whether it did so is a factual issue, not a question of law, and it therefore cannot be decided either on appeal or by the District Court as a matter of law.*

*Id*. at 271) (emphasis added) (vacated on mootness grounds, 2008 WL 2329934 (2008)).[17]

Consistent with this principle is the notion that what an individual plaintiff might think of the

---

[16]     Cases from other federal courts have also held that consumers may proceed to trial with their FCRA willfulness claims, based upon conduct similar to what courts within the Third Circuit have found could constitute a willful violation of the law.  *See, e.g., Reynolds v. Hartford Fin. Servs. Group,* 435 F.3d 1081, 1097-99 (9th Cir. 2006) (discussing meaning of "willfully" and relying on *Cushman*) (reversed by *Safeco* on other grounds, but affirmed by *Safeco* as to willfulness standard); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220 (D.N.M. Mar. 2, 2006) (denying CRA's motion for partial summary judgment and permitting consumer to proceed to trial with her willfulness claim stemming from improper procedures); *Sampson v. Equifax Info. Servs. LLC*, Civ. No. 04-187 (S.D. Ga. Aug. 29, 2005) (denying CRA's motion for summary judgment and permitting consumer to proceed to trial with willfulness claim).

[17]     Equifax relies on a smattering of cases that granted summary judgment for a defendant on the willfulness issue, all of which are distinguishable.  *See Harper v. Trans Union, LLC*, 2009 WL 415940 (E.D. Pa. Feb. 19, 2009); *Godby v. Wells Fargo Bank*, 599 F.Supp.2d 934 (S.D. Ohio 2008).  In both cases, the courts were interpreting sections of the FCRA different from the provision at issue here.  The courts held there was a lack of guiding authority, but also apparently believed that the defendants' reading of the provision was reasonable.  Here, a jury could find that Equifax's interpretation of the statute was not reasonable.  The absence of specific appellate or regulatory opinions is of no material importance here; under Equifax's rationale, a defendant could engage in the most strained and self-serving

action taken against him, his subjective, lay judgment carries little weight.  Mr. Chakejian's personal opinion whether Equifax acted recklessly cannot be factored into the Court's analysis of the question.[18]

> **4.    Plaintiff Has Produced Evidence From Which A Reasonable Jury Could Find That Equifax's Violation Of The FCRA In This Case Was Willful**

While the particular semantics defining a willful violation may ultimately determine the outcome of some cases as it did in *Safeco*, it has no bearing on the instant case given the thorough evidentiary record.  Even if this case were governed by non-Third Circuit pre-*Safeco* standards, and required knowing conduct or concealments and misrepresentations, as opposed to recklessness, summary judgment would still be inappropriate on the issue of willfulness.

First, as discussed throughout this Memorandum, it is uncontested that Equifax sent letters to Mr. Chakejian and the Class which were riddled with knowing misrepresentations concerning what Equifax did in terms of investigating their disputes, who it contacted and what role public courthouses played. *See* discussion at Sections III.A.2-3 and B.3, above. The Letter sent to Mr. Chakejian misrepresented that Equifax contacted the Nix Federal Building, when it had not, that it had sent it "all relevant information" regarding Mr. Chakejian's dispute, when it had not, and that the Nix Federal Building conducted an investigation into his dispute and responded back to Equifax, all of which was untrue. The same Letter was sent to thousands of

---

interpretation of its duties under the FCRA and then maintain it was reasonable because no appellate court had ever said otherwise.  Another case Equifax cites, *Weitz v. Wagner*, 2009 WL 4280284 (E.D.N.Y. Nov. 24, 2009), came after a bench trial, and was not a summary judgment decision.  And in *Krajewski v. American Honda Finance Corp.*, 557 F.Supp.2d 596 (E.D. Pa. 2008), the plaintiff apparently did not contest her inability to show willful conduct.  *Id.* at 617-18.

[18]    For that reason, among others, the cases of *Perez v. Trans Union, LLC*, 526 F.Supp.2d 504 (E.D. Pa. 2007), and *Pinson v. Equifax Credit Info. Services, Inc.*, 2008 WL 2329137 (N.D. Okl. June 2, 2008), carry little weight.  An individual plaintiff cannot be expected to know or testify about the underpinnings of a CRA's decision whether to follow the law.

Pennsylvania Class members.  In addition to deceiving consumers, Equifax misrepresented the activities of the federal government, subjecting courthouses to unnecessary and burdensome visits from Class members such as Mr. Chakejian.  Misrepresentations have consistently been found to be present evidence of willfulness.  *See Cushman, supra.*

Second, not only did Equifax misrepresent its investigation activities, it knowingly concealed the involvement and role of ChoicePoint from Mr. Chakejian and Class members in the investigation of process.  Equifax's true source for the public record information it was reporting about Mr. Chakejian and the Class was ChoicePoint.  Because the FCRA requires CRAs to disclose their reinvestigation results and investigation procedures, Equifax's failure to disclosed ChoicePoint's involvement can only be viewed as an intentional concealment.

Third, Plaintiff has presented evidence that Equifax was aware that its Letter was untruthful and had the capacity to lead consumers to the false belief that a court had investigated their public record dispute.  *See* Section III.B.4  above; Ex. L, DeGrace Dep. at p. 88.   The false nature of the Letter even led Equifax to tell a federal court jury in 2006 that it was being "rewritten" to address such concerns.  *Id.* at Ex. M at pp. 119-122.  Whether that was untrue in 2006, and/or untrue today, is a credibility issue not appropriate for summary judgment. In any event, such testimony proves awareness by Equifax that the Letter did not comply with the FCRA.

Equifax's recklessness is also demonstrated by its awareness of the negative impact that the Letter's misrepresentations can have. Equifax is aware that a portion of its public record errors occur because ChoicePoint, not court personnel, mistranscribes the public record.  *See* Ex. G, Fluellen Dep. at pp. 49-50.   In such instances, not only will the Letter not help a consumer discover and remedy the error, it will hinder the consumer by leading him or her down the wrong

path to believe that the court is reporting the record erroneously. Whether this results in an unnecessary day off from work or out-of-pocket costs for copying unnecessary records or worse for the consumer, these are scenarios Equifax is aware of.

The testimony of DeGrace and Fluellen testimony is not the only evidence of actual knowledge on Equifax's part regarding the Letter's deceptive nature.  As Plaintiff's expert witness Evan Hendricks has opined, Equifax was well aware of its obligations under the FCRA, and had also been presented with consumers being misled in the past.  *See* Section III.B.5., above.

Last, but certainly not least, the evidence concerning Equifax's practice in continuing to use the same Letter today must eradicate any doubt as to the willfulness of its conduct. Despite the past testimony and admissions of its corporate witnesses regarding the Letter's false and deceptive nature, their testimony that it should be changed because it is "not clear", their knowledge of the negative impact its misrepresentations can have on consumers, and the existence of this lawsuit and Mr. Chakejian's experience, it continues to use the identical Letter today.  *See* Ex. G, Fluellen Dep. at pp. 58, 62-64.   As such, a reasonable jury could find that its conduct is clearly reckless, if not intentional.

### 5.    *Safeco's* **"Reasonable Reading" Language Regarding The Term "Increase" Under FCRA Section 1681m Is Not Helpful To Equifax**

Defendant argues that the same defense that prevailed for the insurance company defendant in *Safeco* allows it to obtain summary judgment as to Plaintiff's willfulness claims in this case.  (Def. Mem. at 15-16).  Specifically, Equifax contends that because its reading of the FCRA was not "objectively unreasonable," it is entitled to judgment in its favor.  *Id*.  This argument fails.

It is true that *Safeco* used the phrase "reasonable reading" in finding for the defendant on a willfulness claim under FCRA section 1681m, the FCRA provision at issue in that case.  But that part of the *Safeco* decision is not helpful to Defendant Equifax here.

In *Safeco*, the Court construed not only the meaning of the word "willfully" under section 1681n of the FCRA (as discussed above), but also the meaning of the word "increase" under section 1681m.  The Safeco insurance company had argued that it believed that it was not required to send an "adverse action" notice to first-time customers who were not offered the best insurance rates due to their credit reports.  Safeco contended that section 1681m requires such notices for insurance companies only when there is an "increase" in "any charge or insurance," and consumers who do not *already* have insurance with the company cannot suffer an "increase."  *Safeco*, 551 U.S. at 60-61.  The Court disagreed:  "We therefore hold that the 'increase' required for 'adverse action,'  . . . speaks to a disadvantageous rate *even with no prior dealing*; the term reaches initial rates for *new applicants*."  *Id*. at 63 (emphasis added).

But because the statutory meaning of the term "increase" under section 1681m was "less-than-pellucid," *id*. at 70, and also because there was no FTC guidance or appellate court decision on that issue, the Court concluded that: "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.  The Court thus found that Safeco, under those particularized circumstances, could not be in willful noncompliance with section 1681m of the FCRA, relating to adverse action notices for insurance companies.  *Id.*

This part of *Safeco* decision provides no defense at all for Equifax here.  It goes without saying that Defendant in this case is not an insurance company; this case involves no "adverse action" notices or claims; and no "increase" of insurance rates is at issue.

More critically, this is not a case where there is any evidence of any "reading" or "interpretation" of the FCRA by the Defendant.  Plaintiff sought discovery on whether Equifax had any "reasonable reading" or interpretation of any statutory section of the FCRA which it found confusing, ambiguous or unclear, or which it was relying upon in defense of Plaintiff's willfulness allegations.  Equifax identified none.  Through interrogatory, Plaintiff inquired whether it was relying upon any advice of counsel or "reasonable reading" of the FCRA, and Equifax responded that it was not.  *See* Equifax Response to Plaintiff's Interrogatory No. 19, attached to Plaintiff's Appendix of Exhibits as Ex. P.   Inquiry number 7 of Plaintiff's Rule 30(b)(6) notice of deposition inquired about the identical area, and neither Ms. Fluellen nor Ms. DeGrace testified about any reading of the FCRA which Equifax had which led it to believe that its Letter was compliant.  *See* Renewed Notice of Deposition, dated June 3, 2008, attached to Plaintiff's Appendix of Exhibits as Ex. Q.  In fact, despite Ms. DeGrace's testimony to the contrary at the *Abusaab* trial, it is clear that no one at Equifax considered whether the language in the Letter complied with the FCRA, and whether any changes should have been made.  *See* Ex. G, Fluellen Dep. at pp. 57-58.

Plaintiff attempted to pursue discovery in this case on the issue of whether Equifax's compliance staff or counsel read the statute in an way which supported its defense because, as would appear obvious, if a defendant intends to defend on the basis that its counsel believed defendant's conduct to be compliant with the FCRA, then those communications which would otherwise be privileged are discoverable.  *See Claffey v. River Oaks Hyundai, Inc*., 494

44

F.Supp.2d 976 (N.D. Ill. 2007).  Our Circuit has held that a party can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation. *Rhone-Poulenc Rorer Inc. v. Home Indem. Co*., 32 F.3d 851, 863 (3d Cir. 1994).  As an example, particularly pertinent to this FCRA willfulness case, the Third Circuit stated: "In an action for patent infringement, where a party is accused of acting willfully, and where that party asserts as an essential element of its defense that it relied upon the advice of counsel, the party waives the privilege regarding communications pertaining to that advice (citing cases)."  32 F.3d at 863.

Nonetheless, when questioned concerning the advice provided to Equifax about the legality of the Letter, the testimony of Ms. DeGrace that her attorney had told her the Letter was being rewritten, and the ultimate decision not to revise the Letter despite its obvious flaws, Equifax's counsel either did not recall, refused to answer or was instructed not to answer virtually every question, citing the privilege.  *See* Deposition of Lewis Perling, Esq., attached to Plaintiff's Appendix of Exhibits as Exhibit R, at pp. 44-50, 52-54, 57-65.

Despite Equifax's attempt to align itself with *Safeco*, the record is clear that no layperson or lawyer at Equifax made any "reasonable reading" of the FCRA which led Equifax to the conclusion that the Letter was compliant.  Nor could Equifax now manufacture such a "reading." Even in its Motion, Equifax has never identified any reading of any part of the FCRA that it finds unclear or ambiguous or which it thought permitted it to make the misrepresentations it made in the Letter.  Unlike the meaning of the word "increase" under FCRA section 1681m at issue in *Safeco*, there is nothing "less than pellucid" about the disclosure provisions of sections 1681i(a)(6)(A) or 1681i(a)(6)(B) which would reasonably lead Equifax to conclude that it did not have to be truthful in its disclosures to consumers.

Equifax states the obvious -- that there is no appellate decision or FTC regulation specifically involving the communication in the Letter at issue here.  But that is not the *Safeco* standard.  *Safeco* discussed the "reasonable reading" of the *statutory text*, not of the facts of a particular case.  The insurance company was concerned with the meaning of the word "increase" within section 1681m, not with whether the insurance quote to the consumer in that case was one monetary figure or another, or whether the insurance was for an automobile or a home, or whether the consumer credit report stated that a given consumer owed money on three loans or ten.  The Court in *Safeco* found that there was no legal guidance at all regarding the legal meaning of the term "increase" for insurance companies under section 1681m.

*Safeco* does not require a Court of Appeals decision or clearly established authority as to every conceivable set of facts or for every communication that a CRA might send to a consumer.  *Safeco* only provides a defense to willfulness for a first time violation when the legal standard at issue in the case is genuinely ambiguous, where there is no appellate court or regulatory guidance as to that legal standard, and where the defendant acted pursuant to a reasonable reading of that standard.  That defense does not apply here.  Moreover, that defense does not cancel the general standard pronounced in *Safeco* that a willful violation of the FCRA can be reckless.

Since *Safeco*, several district courts have rejected CRAs' interpretation of the decision, which has the exception swallowing the rule.  In *Gillespie v. Equifax Information Services LLC*, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008), Equifax moved for summary judgment on the willfulness issue shortly after the *Safeco* decision came down.  The court denied the motion.  The court noted that there indeed was an absence of appellate-level decision construing the provision at issue, but emphasized that the "statutory provision at issue here cannot be called 'less-than-

pellucid,'… or anything close to it." 2008 WL 4316950 at *6. "The statutory term's plain meaning put Equifax on notice… For these reasons, Equifax has failed to establish as a matter of law that is interpretation of the statute was objectively unreasonable or, more broadly, that it did not violate the statute recklessly or knowingly." *Id*. at *8.

Another major CRA lost a substantially similar summary judgment argument in a FCRA class action under section 1681e(b) involving the reporting of "charge-offs," "collections," and other derogatory statuses on trade lines that had been included in consumer bankruptcies. *White v. Experian Info. Solutions, Inc.*, Civ. No. 05-1070 (C.D. Cal. Aug. 13, 2007) (at Doc. 169, pp. 5-11) (attached hereto as Exhibit S). Although the ruling in *White* was "tentative," it actually forced Experian to withdraw its motion three days later and the case ultimately settled for $15 million. Judge Crater's detailed analysis of *Safeco* is instrumental and right on point. *See id*. at pp. 5-11. It completely debunks the same flawed arguments that Defendant is making here.

CRAs have recently lost this type of post-*Safeco* willfulness argument in other federal courts as well. *See Campbell v. Experian Info. Solutions, Inc.*, 2009 WL 3834125, at *9 (W.D. Mo. Nov. 13, 2009) (denying agency's motion for summary judgment on FCRA willfulness claim and holding that "[b]y relying on its automated system that did not have the capability of sending an alert when such obvious evidence of a mixed file [inaccuracy] was present, Experian could be found by a reasonable juror to have been reckless."); *Fahey v. Experian Info. Solutions, Inc.*, 571 F. Supp. 2d 1082, 1093 (E.D. Mo. 2008) (denying CRA's motion for summary judgment on FCRA willfulness claim and holding that "the undersigned is unable to say that, as a matter of law, no reasonable jury could find that Experian willfully failed to use reasonable procedures to ensure the accuracy of the credit information it disseminated"). *See also*, *Korman v. Walking Co*., 503 F.Supp.2d 755, 763 (E.D. Pa. 2007) (Robreno, J.) (rejecting similar

argument in FCRA case; "Defendant's reading of the statute has no basis in the statutory text; the statute is clear.").

The notion, therefore, that Equifax is somehow confused about its statutory duty to make truthful and accurate reinvestigation reports to consumers here because there is no appellate decision requiring it to be truthful to consumers, simply does not fly, factually or legally.  The record here provides more than sufficient evidence on which a jury may reasonably make a willfulness or reckless disregard finding.

## V.     CONCLUSION

For all of the reasons set forth above, Defendant Equifax's Motion for Summary Judgment should be denied.

Respectfully submitted,

**FRANCIS & MAILMAN, P.C.**

BY:    *s/ James A. Francis*
JAMES A. FRANCIS
JOHN SOUMILAS
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

**DONOVAN SEARLES, LLC**
DAVID A. SEARLES
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 732-6067

Dated:  April 6, 2010                    Attorneys for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I, James A. Francis, hereby certify that, on this date, I caused a true and correct copy of

the foregoing Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment

to be served by way of ECF Notification upon the following individual:

Lewis P. Perling, Esquire
King & Spalding LLP
1180 Peachtree Street
Atlanta GA 30309-3521

**FRANCIS & MAILMAN, P.C.**

BY:     */s/ JAMES A. FRANCIS*
JAMES A. FRANCIS
Attorney for Plaintiff
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

DATE: April 6, 2010