**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD CHAKEJIAN,** | ) | |
| **on behalf of himself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **C. A. No. 07- 2211** |
| **vs.** | ) | |
| | ) | |
| **EQUIFAX INFORMATION SERVICES LLC,** | ) | **CLASS ACTION** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RESPONSE IN
<u>OPPOSITION TO DEFENDANT'S OMNIBUS MOTION *IN LIMINE*</u>**

Plaintiff, Richard Chakejian, by and through undersigned counsel, on behalf of the certified Class in this matter (collectively "Plaintiffs"), hereby opposes Defendant Equifax Information Services LLC's Omnibus Motion *in Limine* ("MIL").  For the reasons set forth below, the MIL should be denied.

**1.     Equifax's MIL To Preclude Evidence Or Argument Regarding Plaintiffs' FCRA Section 1681i(a)(6)(A) Claim Should Be Denied.**

Equifax's MIL No. 1 seeks preclusion of any evidence or argument introduced by Plaintiffs that Equifax violated FCRA section 1681i(a)(6)(A).  In reality, this is not a motion *in limine*, but a second request for outright dismissal of one of the two claims at issue in the litigation.  Equifax's MIL No. 1 is simply a reiteration of the same argument it made in its summary judgment motion which has been opposed, fully briefed, and is pending before the Court.  *See* Doc. Nos. 74, 81, 87, 94.  For the same reasons that the Court should deny Equifax's attempt to dismiss the section 1681i(a)(6)(A) claim at summary judgment, it should deny Equifax's MIL No. 1.

As discussed in detail in Plaintiffs' Opposition to Equifax's Motion for Summary Judgment, section 1681i(a)(6)(A) of the FCRA is the subsection that requires a consumer reporting agency ("CRA") to accurately provide a consumer with the results of its investigation. Doc. No. 81, at pp. 26-30. Equifax argues that Plaintiffs should be precluded from introducing evidence or argument of such a claim because they failed to plead such a claim, but this is demonstrably false. Plaintiff Chakejian's Amended Complaint more than adequately notified Equifax that its failure to accurately provide Plaintiff and the Class with the (1) results of its reinvestigation and a (2) description of its procedures were the two subsections of 1681i that Plaintiff was proceeding under:

> 28. Pursuant 15 U.S.C. §1681i, if a consumer disputes the completeness or accuracy of information appearing in his or her credit report with a CRA, the CRA must either conduct a reinvestigation of that dispute or delete the information. If the CRA conducts a reinvestigation, it must provide the consumer *written notice of the results of its reinvestigation*, and it may without having to await a request from the consumer, *describe the reinvestigation procedure*.
>
> 29. Pursuant to 15 U.S.C. §1681n, Defendant is liable to the Plaintiff for misrepresenting and willfully misstating the ***results of its reinvestigation*** and its ***reinvestigation procedure*** in violation of 15 U.S.C. §1681i.

Amend. Compl. ¶¶ 28-29 (emphasis added). Thus, Equifax cannot credibly support preclusion of any evidence or argument introduced by Plaintiffs that Equifax violated FCRA section 1681i(a)(6)(A) upon Plaintiffs' failure to plead.

As it did in its summary judgment motion, Equifax next argues that Plaintiffs' section 1681i(a)(6)(A) claim is deficient because Equifax provided Mr. Chakejian with s*omething* purporting to be the results of its investigation (*i.e.*, the Letter), irrespective of the accuracy or truthfulness of that disclosure, and that Equifax should be insulated from liability as a result. To

the extent that is the case, and Equifax is asking the Court to read this FCRA section in a way which would carry no implicit qualitative aspect regarding the veracity or accuracy of the disclosure, this Court should reject such as a reading as contrary to Congress' findings and the FCRA's remedial purposes.  *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996).  Certainly, it cannot be reasonably fathomed that Congress intended to impose disclosure requirements on CRAs which could be avoided through the simple use of misrepresentations and deceptions.[1]  Again, this is the precise argument Equifax made in its summary judgment motion, and the argument should be denied for the same reasons articulated by Plaintiffs in response to that motion.

2.    **Equifax's MIL To Preclude Plaintiffs From "Portraying" The Letter At Issue In The Litigation As A "Description Of Procedures" Should Be Denied.**

Equifax's MIL No. 2 seeks preclusion of Plaintiffs' reference to or "portrayal of" its Letter (Exhibit A to the Amended Complaint, Exhibit E to Plaintiffs' Opposition to Summary Judgment) as a description of Equifax's reinvestigation procedures.  Def. Mem. at 2-3.  This MIL should be denied.  As with Equifax's MIL No. 1, Equifax's MIL No. 2 is simply a

---

[1]    Equifax relies upon several cases that are inapposite to the issues in this case.  *Nunnally v. Equifax*, 451 F.3d 768 (11th Cir. 2006) and *Morris v. Trans Union LLC*, 420 F. Supp. 2d 733 (S.D. Tex. 2006), merely stand for the unremarkable proposition that the FCRA requires that a CRA provide consumers with a consumer report after a reinvestigation.  In *Nunnally*, the issue was whether a one-page letter in response to a dispute (as opposed to providing the complete consumer file) satisfied Equifax's obligation, and the appellate court held that it did.  451 F.3d at 772-776.  In *Morris*, the *pro se* plaintiff asserted a failure to reinvestigate a dispute arising from the inclusion of his ex-wife's debt on his consumer report.  The court held that there was no proof of actual damages and that the CRA's reinvestigation was reasonable as a matter of law.  420 F. Supp. 2d at 738-41.  It is difficult to understand why Equifax considers this supportive of its MIL.  Each case is based upon a totally different set of facts and neither one considers any issue of accuracy or truthfulness in the reinvestigation reports.  The holdings in those cases have no bearing on Plaintiffs' claims here that Equifax made false and misleading form communications to consumers.

reiteration of the argument it asserted at summary judgment in seeking dismissal of Plaintiffs' section 1681i(a)(6)(B)(iii) claim.

As it did in its summary judgment brief, Equifax argues that Plaintiffs' FCRA section 1681i(a)(6)(B)(iii) claim should be dismissed because Plaintiff Chakejian did not request a description of its reinvestigation procedures.   In his Opposition Memorandum, Plaintiff Chakejian  demonstrated the flaws of Equifax's argument, namely the fact that Mr. Chakejian testified that he did make such a request (and thus there is a disputed factual issue), and separately that Equifax's witnesses testified clearly that Defendant sends a description of its procedures *to every consumer* who disputes a public record at the conclusion of its investigation, without awaiting a request from the consumer.   *See* Pl. Opp. Mem., Doc. No. 81, at 26-35.  For the same reasons discussed more thoroughly in Plaintiffs' Opposition Memorandum, Equifax's second MIL should be denied.

**3.      The Testimony Of Equifax's Shawn DeGrace From The *Abusaab v. Equifax* Trial Is Material To This Case, And Thus Cannot Be Excluded As Equifax Argues.**

In MIL No. 3, Equifax seeks to exclude the harmful but highly relevant testimony of its corporate representative, Shawn DeGrace, offered in the 2006 trial in *Abusaab v. Equifax*.  Def. Mem. at 3.  This MIL must fail because Ms. DeGrace's testimony from the *Abusaab* trial is highly relevant to Equifax's notice of the violation that is the subject of this action; Equifax's false representations about allegedly correcting or "re-writing" the form Letter that is the subject of this action; and Equifax's willful non-compliance with FCRA section 1681i(a)(6) since at least 2006.

Equifax sent the same form Letter to consumer Shadee Abusaab several years ago -- following a dispute of an inaccurate public record in his Equifax credit report about a judgment allegedly lodged against him at Philadelphia City Court -- that it also sent Mr. Chakejian and the

4

Class here.  In the 2006 trial in the *Abusaab* matter, Equifax's Shawn DeGrace, *testifying (like in this case) as a corporate representative*, was forced to concede that Equifax's representations regarding its purported "direct" contacts and communications with its "source," Philadelphia City Court, were untrue.  She further testified that Equifax was "glad" that the Letter's false nature was brought to its attention, and that Equifax was "re-writing" the Letter because Equifax "agree[d]" with the plaintiff's counsel that the letter was "not clear":

> Q.      Below are the results of your request for Equifax to reinvestigate certain elements of your Equifax credit file, Equifax *contacted each source directly* and our investigation is complete.  That's false, isn't it?
> A.      That is incorrect.  *Yes, that's incorrect*.  We did not. We accepted the documentation.
> Q.      Equifax did not contact any source directly or indirectly?
> A.      In this particular case, that is correct.
> Q.      In both of these particular occasions. In June and in July?
> A.      That is correct.
> Q.      *So that statement was false?*
> A.      It's a form letter.  It's for consistency purposes.
> Q.      *Was it true?*
> A.      *It's not, in this case*.  We accepted documentation, which we go on to explain further in the letter.
> Q.      It's false in the case of Mr. Abusaab?
> A.      We accepted documentation, you're correct.
> Q.      Now, looking at the second page of these letters, again, this is form text, that's why it goes out to everybody, right?
> A.      Correct.
> Q.      *Do these letters still go out today*?
> A.      *We are actually in the process of re-writing these letters.  We are re-writing that first paragraph because we agree with you.*  We don't sometimes we accept the documents and we need to be more clear about that.  But we send out thousands of letters.  We need a consistency and that's what this is all about.  *That's why the form letter says what it says.  It's for consistency.  And we agree it's not clear and we're very glad you brought that to our attention because no one had ever brought that to our attention until you did.*
> Q.      Now, let me follow up on that point.  No one had brought

it to your attention.  How would a consumer possibly know
that Equifax did not go to the courthouse?

• • •

Q.      Look at the bottom text, ma'am, of the first paragraph.
A.      Okay, where would you like me to start?
Q.      The name, address, and if reasonably available the
telephone number of the furnishers of the information
contacted while processing your dispute is shown under the
results of your investigation section of the cover letter.
Do you see that?
A.      Yes.
Q.      What is that referring to in the case of Mr. Abusaab?
What is the contact information under results of
investigation?
A.      It's referring to where the information is filed.  The
source of the information.
Q.      Philadelphia City Court, Broad and Market Street.
A.      Correct.
Q.      *Nobody contacted the Philadelphia City Court at Broad
and Market Street.*
A.      *In these two investigations, no.*
Q.      And there is no way that a consumer would know just by
reading this letter that Equifax didn't do what it said it
did.
A.      I agree.  *I think we need to be more clear.*
Q.      So, how would a consumer complaint to Equifax if they
don't go and take a deposition and figure out what's going
on?
A.      *Well, I'm very glad you brought it to our attention now.*

See Testimony of Shawn DeGrace given in *Abusaab v. Equifax Information Services*, C.A. 05-

5094 (E.D. Pa.) on May 17, 2006, at pp. 119-122, attached to Plaintiff's Appendix of Exhibits in

Opposition to Equifax's Motion for Summary Judgment as Exhibit M.

Abusaab v. Equifax was the first case, to Plaintiffs' knowledge, where evidence came to

light about Equifax's failure to "investigate" public record disputes "directly" with the courts, as

it represents to consumers, and its failure to disclose the actual source of its public records

information -- ChoicePoint.  Indeed, Equifax, via Ms. DeGrace, thanked consumer Abusaab for

bringing the inaccuracies of the form Letter to Equifax's attention allegedly for the first time.  *Id.*

The form Letter, however, was not being "re-written" in 2006, or at any time, despite Ms. DeGrace's testimony to a federal court and jury above.  Indeed, the form Letter has, to date, not been "re-written" *in any way whatsoever*.

In a case like this, alleging willful non-compliance with the FCRA, the above evidence is crucial and highly relevant for Plaintiffs.  It shows Equifax's knowledge of the misleading nature of the Letter since 2006.  It shows the extent to which Equifax will go to conceal the identity of ChoicePoint, its furnisher of public records, and also to conceal the true nature of its "reinvestigation" procedures concerning consumer public records disputes.

Equifax's arguments that the *Abusaab* matter was "completely different" and has "nothing to do with this case"  (Def. Mem. at 4) are disingenuous.  The testimony quoted above from Ms. DeGrace in *Abusaab* is about the exact form Letter and the exact language within the form Letter that is the subject of this action.  The fact that Equifax purportedly accepted Mr. Abusaab's documentation and did not accept Mr. Chakejian's documentation did not change the result one iota.  Equifax sent both consumers the same form Letter with the same boilerplate misrepresentations.  Ms. DeGrace's testimony in *Abusaab* is surely harmful to Equifax, but it is not irrelevant or unfairly prejudicial.  Nor will it confuse the jury, as Equifax argues.

 Moreover, the fact that Mr. Abusaab had  claims under FCRA sections 1681i(a)(1) and 1681e(b) -- as opposed to FCRA section 1681i(a)(6) -- is of no moment.  Regardless of the exact legal claim, the form Letter and practices leading to it were the same.  Ms. DeGrace's testimony in *Abusaab* is about the facts (*i.e.*, the Letter), not about the FCRA's legal requirements.

In that connection, it should also be noted that even in a sister case to this action, *Summerfield v. Equifax* -- involving the exact same FCRA section 1681i(a)(6) claim as in this

case -- Ms. DeGrace again testified in 2009, as an Equifax corporate representative, that the

exact same form Letter is misleading:

> Q: [T]he third sentence [of the Letter] I believe, it reads, "The source reviews the information provided, conducts an investigation with respect to the disputed information, and reports the results back to us."
>
> • • •
>
> Q: I'll read it from the beginning, but I think it's the third sentence.
> A: Okay.
> Q: [The Letter] describes the process. "Upon receipt of your dispute we first review and consider the relevant information you have submitted regarding the nature of your dispute." That's true, correct?
> A: It's my understanding they do that, yes, in consumer services.
> Q: "If the review does not resolve your dispute and further investigation is required, notification of your dispute, including the relevant information you submitted, is provided to the source that furnished the disputed information," correct?
> A: Correct.
> Q: And you've told me who the source is in the case of Mr. Summerfield?
> A : Correct.
> Q Camden County Court, City Hall, Camden, New Jersey. The next sentence is the source. Is that correct, by the way?
> **A We did not do that, no.**
>
> • • •
>
> Q Would you agree with me that the source did not conduct an investigation for Equifax?
> A The source couldn't because it's, or, **well, it's, I mean, that's hard to answer.** We went to the source. You know, that's all I can say. **I don't know** if I -- the source is a record here; it's not a person.
>
> • • •
>
> **Q Do you think that that could mislead consumers into believing that the courthouse actually conducted some type of an investigation?**
> **A: I agree.**

DeGrace Jan. 2009 Dep. in *Summerfield v. Equifax*, Civ. No. 08-1450 (D.N.J.), at 68:8-69:15,

72:24-75:5, 88:7-16 (attached hereto as Exhibit 1) (emphasis added).  The notion, therefore, that

Ms. DeGrace's testimony in *Abusaab* in 2006 was somehow out of context or an aberration is

simply hollow.  Ms. DeGrace has always found the Letter to be misleading.

    Finally, Ms. DeGrace's testimony in *Abusaab* was not simply her "subjective belief,"

which Equifax improperly dismisses as irrelevant under *Safeco*.  Ms. DeGrace was Equifax's

corporate representative in *Abusaab*, as she was in *Summerfield*, and as she is in this case. She speaks for Defendant. Her testimony tends to show Equifax's knowing non-compliance with the FCRA, its knowing concealments and its reckless conduct with respect to the false form Letter that is the subject of this case. This is highly relevant to any FCRA willfulness claim, and absolutely nothing in *Safeco* even suggests that a jury is precluded from hearing such evidence.

If Ms. DeGrace's testimony from *Abusaab* is excluded Equifax could try the same tricks here that it tried in *Abusaab*. It can be misleadingly to tell the jury that it had no idea that there was anything inaccurate or misleading about the Letter -- and worse that it is now seeking to "re-write" the letter since Mr. Chakejian has brought the Letter's inaccuracies to its attention. This type of second deception cannot be permitted.

**4.      Plaintiffs May Be Permitted To Call Lewis Perling As A Witness.**

Equifax's MIL No. 4 seeks to preclude Plaintiffs from calling Equifax's attorney, Lewis Perling, Esq., as a witness. Plaintiffs anticipated this motion by Defendant with his own motion *in limine* No. 6, seeking to preclude Equifax from offering certain defenses to the willfulness claim. Doc. No. 105-1 at pp. 8-10.

There are at least three reasons why Mr. Perling may be called as a witness.

First, he may have important, relevant information. Equifax witness Shawn DeGrace testified in *Abusaab v. Equifax* that her understanding was that the subject form Letter was being re-written or changed. Mr. Perling was one of her attorneys in that case, helped her prepare her testimony and, as do most lawyers, presumably reported to his client Equifax on the developments in that trial. Ms. DeGrace testified in her depositions both in this case and in the related *Summerfield* case that her understanding of the change in the letter came from conversations with her attorney only. She did not review any records or speak with any person,

other than Mr. Perling, concerning the purported changes to the letter.  Given the central role played by the Letter in this case, Plaintiff is entitled to question Mr. Perling on the subject.  Whether or not Ms. DeGrace learned of the impending changes from an Equifax lawyer, or relied on the lawyer's information in any way for her testimony in *Abusaad* and the depositions in *Chakejian* and *Summerfield*, is relevant to the issues in this case.

Second, Mr. Perling's testimony would impact on Ms. DeGrace's credibility with respect to whether the Letter was in fact in the process of being re-written or changed in any way.   If Ms. DeGrace was making up her testimony in *Abusaab* or in the aforementioned depositions, the jury in this case has the right to know that.  If Mr. Perling supports Ms. DeGrace's testimony, that would be important to know as well.

Third, Equifax's overriding defense in this case is that it did not act willfully in using the Letter.  Defendant argued in its summary judgment motion that because its reading of the FCRA was not "objectively unreasonable," it did not act willfully and was therefore entitled to judgment in its favor.   Mr. Perling, as counsel to Equifax, will have evidence concerning Defendant's view (or "reading") of the legality of the Letter.  Indeed, Mr. Perling and other Equifax attorneys may well have advised Equifax about the legality.  If Equifax intends to rely upon the advice of its counsel, or any "reading" made by counsel, for such a defense to willfulness, Plaintiffs are entitled to explore that subject.  In fact, Plaintiffs did attempt to obtain Mr. Perling's testimony after he agreed to be deposed.  However, as pointed out in Plaintiffs' Motions *in Limine*  (Doc. No. 105-1, at 9-10), Mr. Perling either did not recall, refused to answer or was instructed not to answer virtually every such question, citing attorney-client privilege.

Equifax relies on *Falconey v. Wachovia Bank, N.A.*, 254 F.R.D. 204 (E.D. Pa. 2004), but that case did not arise in the context of a FCRA willfulness defense and is simply a generic

discussion of the attorney client privilege doctrine.  Moreover, *Falconey* alludes to one particular exception to the privilege that is analogous to the circumstances here.  254 F.R.D. at 210, n. 6. That exception exists if it can be shown that a client uses a lawyer's services to further a crime or fraud.  *Id*, (*citing In re Grand Jury Investigations*, 445 F.3d 266, 274 (3d Cir. 2006)).  While Plaintiffs does not suggest that Equifax was engaged in criminal activity, they do claim that Equifax has violated a civil statute and, by analogy to the crime-fraud exception, Equifax cannot hide behind the privilege in defending its actions.  *See also Rhone-Poulenc Rorer Inc. v. Home Indem. Co*., 32 F.3d 851, 863 (3d Cir. 1994) ("where a party is accused of acting willfully, and where that party asserts as an essential element of its defense that it relied upon the advice of counsel, the party waives the privilege regarding communications pertaining to that advice (citing cases)."

Mr. Perling should not be precluded from testifying in this case.

**5.      Equifax's MIL to Preclude Evidence and Argument Regarding a Letter that Would Have Been Sent Had Plaintiff Requested a Description of Equifax's Procedures Should be Denied.**

Equifax's MIL No. 5 is simply another iteration of its MIL No. 2, and is substantively non-sensical.  Equifax seeks preclusion of testimony or argument that regarding a letter that would have been sent had Plaintiff requested a description of Equifax's reinvestigation procedures. This MIL fails for the same reasons as its MIL No. 2.

As set forth in Plaintiff's Opposition to Summary Judgment, Plaintiff Chakejian testified that he did request information about Equifax's procedures, and that Equifax sends all information, including a description of its procedures, to consumers at once following a second dispute. *See* Doc. No. 81, Pl. Opp. Mem. at pp. 26-35.  Thus, the factual record does not support Equifax's MIL No. 5.  As such, while the parties may differ regarding what Equifax's legal

obligations were in connection with handling Mr. Chakejian's disputes, neither party will be arguing or presenting evidence that Equifax itself sends another or different letter describing its procedures following a public records dispute.

Moreover, the fact is that when taken together with MIL No. 2, Equifax's MIL No. 5, if granted, would lead to a result which would create absurdity and confusion for the jury, and prejudice to Plaintiffs.  Equifax argues (albeit incorrectly) as it did at summary judgment that Mr. Chakejian did not make a request for a description of its reinvestigation procedures, and thus that the Letter it sent was *NOT* a description of its procedures.  Equifax apparently denies the admissions of its representatives who testified that the Letter at issue did contain its reinvestigation procedures. Yet, at the same time, Equifax wants to preclude Plaintiffs from rebutting or responding to that argument by examining its witnesses as to what other letter it would send assuming a consumer did make the type of request it believes necessary to trigger its legal duty or arguing that there was no such letter.  In reality, the motivation behind Equifax's MIL No. 5 is that there is no such letter that Equifax sends following a public records dispute other than what it sent to the Plaintiff and Class members, nor has there ever been, and it does not want the jury to know that.  Once the jury knows that, it will know that Equifax's "lack of a Plaintiff request" argument is bluntly speaking, a sham.  For all of these reasons, MIL No. 2 and MIL No. 5 should be denied.

**6.      Since A Willful Violation Of The FCRA Would Expose Equifax to Punitive Damages Plaintiffs Must Be Permitted To Offer Evidence Of Equifax's Net Worth.**

In MIL No. 6, Equifax moves to exclude its own Annual Reports from this FCRA willfulness case.  Def. Mem. at 7.  This argument must fail.

A willful violation of the FCRA exposes a defendant to punitive damages.  *See* 15 U.S.C. § 1681n.  Given Plaintiffs' claims in this case of willful FCRA violations, Plaintiffs identified

Equifax's Annual Reports for 2005-2009 as a single trial exhibit -- Exhibit P-16 -- exactly as those reports presently appear on Equifax's website, Equifax.com.  *See* Ps.' Pretrial Memo., Docket No. 93, at 10.  Plaintiffs referred Equifax to http://www.equifax.com/investor_center/en_us for an electronic copy of those Annual Reports.

Earlier in the case, Plaintiff Chakejian also sought discovery on Equifax's financial status and net worth.  Equifax responded as follows:

**INTERROGATORY NO. 20:**

State the amount of Defendant's net worth as of December 31st for the years 2006 or 2007 and identify all documents upon which such determination was made.

**RESPONSE TO INTERROGATORY NO. 20:**

Equifax objects to this request because it is overbroad, unduly burdensome, irrelevant, and is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving these objections, Equifax states that this type of financial information would only become relevant if and when Plaintiff sustains his burden of proving that punitive damages are warranted here, which Equifax denies.  Plaintiff has not stated a prima facie case for discovery of this information and the request for such information is premature. **Equifax is willing to enter into a stipulation concerning its net worth for use at trial if this case is tried.**

**REQUEST FOR PRODUCTION NO. 8:**

Any document showing your net worth for 2006 or 2007.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Equifax objects to this request because it is overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to these objections, Equifax responds as follows: This type of financial information would only become relevant if and when plaintiff sustains his burden of proving that punitive damages are warranted here, which Equifax denies.  Plaintiff has not stated a prima facie case for discovery of this information and the request for such information is premature.  **Equifax is willing to enter into a stipulation concerning its net worth for use at trial if the case is tried.**

**REQUEST FOR PRODUCTION NO. 9:**

All of your current balance sheets and financial statements, including annual reports for the previous 2 years.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Equifax objects to this request because it is overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to these objections, Equifax responds as follows: This type of financial information would only become relevant if and when plaintiff sustains his burden of proving that punitive damages are warranted here, which Equifax denies.  Plaintiff has not stated a prima facie case for discovery of this information and the request for such information is premature.  **Equifax is willing to enter into a stipulation concerning its net worth for use at trial if the case is tried.**

Equifax's Responses to Interrogatory No. 20 and Requests for Production Nos. 8-9, dated April 14, 2008 (emphasis added) (attached hereto as Exhibit 2).

Thus Equifax failed to produce paper or electronic copies of its own Annual Reports or other financial records during discovery, but said that it was willing to "stipulate" to its net worth "if the case is tried."  *Id.*  Plaintiffs referred Equifax to its own Annual Reports, which are publically available with the SEC, and also publically available electronically on Equifax's own website.  Those records plainly show that Equifax's net worth for 2009 was $1,615,000,000.  Equifax's Annual Report 2009, Balance Sheet Data, p. 11 (attached hereto as Exhibit 3).

Now, with this case about to "be tried" Equifax is engaging in disingenuous gamesmanship.  It states that its own Annual Reports have not been "authenticated" or produced in a "paper version."  Def. Mem. at 7.[2]   Given Equifax's discovery posture, discussed above,

---

[2]   It bears noting that Equifax does not come to this Court with clean hands in making this argument.  Most of the discovery exchanged in this matter has been in electronic form, not paper form.  In fact, upon the agreement of counsel, all trial exhibits, for both Plaintiffs and Defendant, were exchanged in electronic form, not in "paper" form.

and the fact that its own Annual Reports are public documents, filed with the SEC, and properly identified by Plaintiffs, Part No. 6 of Equifax's MIL is baseless.

In this FCRA willfulness case, Plaintiffs should minimally be able to either reference or show to the jury Equifax's 2009 Annual Report and advise the jury that Equifax's net worth, as of December 31, 2009, was just over $1.6 billion.

**7.     Plaintiffs Would Agree To Bifurcate Punitive Damages, Provided Equifax Does Not Unfairly Seek To Introduce Punitive Damages-Type Defenses During The Statutory Damages Phase.**

In MIL No. 7, Equifax seek to bifurcate the punitive damages phase of this case by prohibiting Plaintiffs from introducing any evidence of, or making any reference to, Equifax's "net worth, assets, or financial condition" during the course of the trial "unless and until the jury has returned a verdict against Equifax with a finding that it willfully violated the FCRA."  Def. Mem. at 8.  Plaintiffs are willing to not seek punitive damages, and not introduce any evidence of Equifax's net worth, *until after* a "willfulness" finding by the jury on their FCRA statutory damages claims, provided that Equifax does not improperly seek to introduce or make punitive damages-type defenses during the statutory damages phase of the case.

As a general matter, this trial should not and cannot be bifurcated.  The same evidence of willfulness will support Plaintiffs' argument for liability and their claim for both statutory and punitive damages under FCRA section 1681n.  The only evidence that is unique to punitive damages is Equifax's net worth, which comes from its own Annual Reports, discussed *infra* at No. 6.

 In this case, however, bifurcation of punitive damages is acceptable to Plaintiffs in a separate closing argument phase, after a jury finding of willful non-compliance by Equifax and

an award of statutory damages to Plaintiffs, where the only additional element of evidence presented to the jury for the punitive damages phase of closing arguments is Equifax's net worth.

To be precise, Plaintiffs would agree to a separate punitive damages phase only under the following conditions:

(a) All other admissible evidence on willfulness, other than financial data from Equifax's Annual Reports (identifying its $1.6B net worth), is presented to the jury during a single trial. General evidence of Equifax's credit reporting operations is not excluded.

(b) At the close of the Defendant's case, and following any unsuccessful Rule 50 motion by Equifax, the jury would be presented with a "Phase 1" of closing arguments, at the conclusion of which the jury would return a verdict on liability on Plaintiffs' claims of willful non-compliance under the FCRA, and award statutory damages to Plaintiffs if it finds a willful violation.

(c) Plaintiffs cannot reference Equifax's Annual Report or its net worth prior to or during "Phase 1."

(d) Equifax cannot reference prior to or during "Phase 1" that a statutory damages award would be a "penalty" or "punishing" or any other word that relates to punitive damages, and cannot make any punitive damages argument to the jury.

(e) Further, Equifax cannot reference prior to or during "Phase 1" that any statutory damages award would be detrimental in any way to Equifax's business or that Equifax does not have the economic capacity to absorb any such statutory damages award.

(f) If the jury returns a willfulness verdict for Plaintiffs, there is a "Phase 2" of closing arguments on the subject of punitive damages only. During that "Phase 2," Plaintiffs may introduce the additional evidence of Equifax's net worth via its 2009 Annual Report.

The important point here from Plaintiffs' perspective is that Equifax should not receive any benefit by not having evidence of its net worth introduced to the jury "unless and until the jury has returned a verdict against Equifax with a finding that it willfully violated the FCRA." Equifax cannot have evidence of its net worth excluded and punitive damages bifurcated so that it can unfairly argue during the statutory damages phase of the case ("Phase 1," above) that it is

16

being punished by statutory damages or that it does not have the financial wherewithal to pay a statutory damages verdict, because that would simply be false and unfair.  If Equifax cannot meet the conditions above, no bifurcation of any type would be appropriate.

**8.     Plaintiffs Proffer An Appropriate Credit Reporting Expert In Evan Hendricks Whose Testimony Cannot Be Excluded.**

**a.  Introduction**

Evan Hendricks is one of the foremost experts in the nation on the FCRA.  He is eminently, and perhaps uniquely, qualified to testify to the matters at issue in this case.  His expertise is based on almost 30 years of work in the fields of credit reporting and privacy, along with review of thousands of pages of credit reporting agencies' materials not available to the public.

Mr. Hendricks has been found to be qualified as an expert witness on FCRA issues by state and federal courts across the country.  In the last five years alone, he has testified as an expert witness at trial in eleven credit reporting cases.  He has been retained as an expert in litigation brought by the Federal Trade Commission, the agency responsible for enforcement of the FCRA.

Mr. Hendricks has been asked to testify before Congress on numerous occasions regarding credit reporting.  In fact, a few months ago Mr. Hendricks testified on credit reports and credit scores before the House Financial Services Committee.  For a number of years he has served as an expert on privacy issues as a panel member for the Social Security Administration. Equifax has recognized Mr. Hendricks as an expert on privacy issues.  He has served on an advisory council for another credit reporting agency, Experian, on issues of credit reporting, marketing and other privacy-related topics.  He also passed an industry examination and earned an "FCRA Certification" from the National Credit Reporting Association.

### b.  Issues in This Case

This case is about Equifax's procedures for handling and responding to consumer disputes and its reporting of public record information.  Mr. Hendricks is qualified to testify and assist the jury in understanding these issues.  In fact, most of the cases in which he has been an expert witness involve the procedures required by the FCRA for handling and responding to consumer disputes, and many deal specifically with Equifax's procedures.

In 2007, he testified as an expert in a case against Equifax that dealt with Equifax's procedures for responding to a consumer's repeated attempts to get false information corrected: *Williams v. Equifax Information Services*, Civ. No. 48-2003-CA-9035 (Fla. Orange Cty. Ct. 2007).  He also testified in the following cases regarding Equifax's procedures on consumer disputes: *Valentine v. Equifax Information Services*, Civ. No. CV-05-801-JO (D. Or.); *Robinson v. Equifax Information Services*, Civ. No. 1:06-cv-1336 (E.D. Va.); *Sloane v. Equifax Information Services*, Civ. No. 1:05-cv-1272 (E.D. Va.); and *Kirkpatrick v. Equifax Information Services*, Civ. No. CV-02-1197-MO (D. Or.).

### c.  Mr. Hendricks Is Qualified And His Opinions Are Reliable Because Of His Specialized Knowledge And Expertise.

Under Fed. R. Evid. 702, an expert may be qualified because of specialized knowledge, skill, experience, training or education.  The basis for expert testimony may focus on personal knowledge or experience.  *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  The Rule 702 inquiry is flexible because there are many different kinds of experts, and many different kinds of expertise.  *Id.* (*citing Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993)).  "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702 Committee Notes.

The trial court has broad discretion in considering whether to qualify an expert.  *Goebel*

*v. Denver & Rio Grande Western R.R.*, 346 F.3d 987, 992 (10th Cir. 2003) (*citing Kumho Tire Co.*, 526 U.S. at 150; *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000) (*Kumho* also makes it clear that the gatekeeping function is a flexible and common sense undertaking).

Cases interpreting and applying *Daubert* have emphasized that the trial court has broad discretion in determining whether an expert's opinion is reliable. *U.S. v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) ("A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."). Reliability is not restricted to the scientific method, but "may focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150.

### i.    Courts Have Qualified Mr. Hendricks to Testify on the Subjects in this Case.

Evan Hendricks has been admitted as an expert on credit reporting and privacy issues in numerous courts.  A complete list of the cases in which he has been retained as an expert is contained in his CV that is part of his expert report submitted with Equifax's MIL No. 8.  Def. Mem. at 34-42.

As credit reporting cases have become more common in the last five years, Mr. Hendricks has been particularly busy.  He has testified in at least ten FCRA *trials* just since 2005: *Campbell v. Experian Information Solutions*, Civ. No. 07-2514 (W.D. Mo.); *Gamby v. Equifax Information Services*, Civ. No. CV-06-11020-MO (E.D. Mich.);  *Adams v. National Engineering Service Corp./Verifications Inc.*, Civ. No. 3:07-cv-01035-JCH (D. Conn.);  *Holmes vs. TeleCheck Intl., Inc.*, Civ. No. 3:05-0633 (M.D. Tenn.); *Williams v. Equifax Information Services*, Civ. No. 48-2003-CA-9035 (Fla. Orange Cty. Ct.); *Valentine v. Equifax Information Services*, Civ. No. CV-05-801-JO (D. Or.); *Robinson v. Equifax Information Services*, Civ. No. 1:06-cv-1336 (E.D. Va.); *Cortez v. Trans Union*, Civ. No. 2:05-CV-05684-JF (E.D. Pa.);  *Sloane*

*v. Equifax Information Services*, Civ. No. 1:05-cv-1272 (E.D. Va.); *Kirkpatrick v. Equifax Information Services*, Civ. No. CV-02-1197-MO (D. Or.).[3]

The *Kirkpatrick* case, like this one, involved Equifax's procedures in responding to consumer disputes.  Judge Michael Mosman carefully studied the parties' briefs and Mr. Hendricks' expert report, and concluded he was qualified to testify as an expert witness.  Judge Mosman noted Mr. Hendricks' study and research in the field, as well as his access to deposition testimony and other information that is not available to the public.

> The sources of his study are sufficient to qualify him as an expert both with regard to what he has read, and that includes not only his own paper that he puts out, but the deposition testimony is a sufficiently precise and unavailable source of expertise that it would be helpful to the jury to hear from someone who has assimilated that sort of information.

*See* Excerpts of Preceding before the Honorable Michael W. Mosman, in Kirkpatrick v. Equifax, (attached hereto as Exhibit 4).

Judge Mosman also stated:

> As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury.

*Id.*, at page 3, lines 12-20 (at bottom).

Mr. Hendricks has also been found qualified by the Ninth Circuit in an FCRA case brought against TRW, the predecessor of Experian.  *Andrews v. TRW, Inc.*, 225 F.3d 1063 (9th

---

[3]    Mr. Hendricks also testified as an expert at trial in *Terry v. Star Consulting*, Prince George's County Circuit Court, Maryland, which was not an FCRA case but involved damage to the credit of an employee because he was listed as a debtor on his former employer's credit card accounts.

Cir. 2000), *rev'd on other grounds*, 534 U.S. 19, 122 S. Ct. 441 (2001).   In *Andrews*, the consumer claimed that TRW violated the FCRA by sending her credit reports out to creditors who were dealing with a person who had stolen her identity.   The trial court ruled that Mr. Hendricks could not testify.   The Ninth Circuit reversed, holding that Mr. Hendricks' opinions would be useful to the jury.   *See Andrews,* 225 F.3d at 1067.

Equifax has searched through the scores of cases in which Mr. Hendricks has been retained as an expert and found *only one* in which his expert testimony was not allowed.   That fact alone is convincing proof that he is an expert in this field.   Moreover, Equifax cites only three cases in which Mr. Hendricks' testimony was limited: *Andrews*, *Harris*, and *Pasternak*.   In each of those cases, the courts found that Mr. Hendricks was qualified as an expert, but simply limited his testimony.

Equifax cites the 1998 ruling limiting Mr. Hendricks' testimony in *Andrews.*   However, as noted above, the Ninth Circuit reversed the lower court and held that Mr. Hendricks should have been allowed to testify.   *See Andrews,* 225 F.3d at 1067.

In *Pasternak*, the consumer's case was primarily against Capital One.   Mr. Hendricks' expert report was almost exclusively about the actions and issues regarding Capital One.[4]   The report had only one short paragraph concerning Equifax, and that paragraph only discussed the wrongful disclosure of Ms. Pasternak's credit report by Equifax.   That was why the judge limited Mr. Hendricks' testimony.   She stated that her "problem" was she was not sure "what he's going to say."   Def. Mem. at Ex. F, p. 2.   The court specifically noted that Mr. Hendricks could theoretically testify on actions Equifax had taken but would not allow it because "he can't say things that he didn't disclose in his report."   *Id.*   The judge did *not* hold that he was not qualified.

---

[4]      One of Plaintiffs' counsel in this case, Robert Sola, was co-counsel for the plaintiff in *Pasternak*, giving him knowledge of the facts.

She stated that Mr. Hendricks' expertise, although self-taught, "isn't disqualifying." *Id.* She stated he could not testify on the particular damages suffered by the consumer because "he doesn't know that and that is not the subject of expert testimony." *Id.*

The expert report in this case contains extensive detail on Mr. Hendricks' testimony. The reasoning from the *Pasternak* case simply does not apply.

### ii. Mr. Hendricks Has Studied the Credit Reporting Industry for Three Decades.

Mr. Hendricks' specialized experience and knowledge goes beyond his involvement in scores of FCRA cases. Mr. Hendricks has closely studied the credit reporting industry for 30 years. He has published the *Privacy Times* newsletter, which monitors the credit reporting industry since 1981.

In 2004, Mr. Hendricks wrote the authoritative book on credit reporting: *Credit Scores and Credit Reports: How the System Really Works, What You Can Do* (Privacy Times 2004). Mr. Hendricks' book, nearly 400 pages in length, contains chapters specifically addressing the issues in this case: mixed files, reinvestigations of consumer disputes, and the failures of credit reporting agencies to correct errors.

### iii. Mr. Hendricks Has Acquired Extensive Knowledge Despite the Secrecy Maintained by the Credit Reporting Industry.

The credit reporting industry tries to maintain tight control over its operations. Three large national companies dominate the field, and they each protect their proprietary company data very carefully. An outsider is simply not allowed access to their policies and procedures. But Mr. Hendricks has been allowed to review the details of those policies and procedures, both in written form and through the deposition testimony of the agencies' representatives. For that reason, Mr. Hendricks is nearly unique in his knowledge and understanding.

Through Mr. Hendricks' role as an expert witness in dozens of credit reporting cases, he has reviewed countless deposition transcripts from employees of credit reporting agencies.  He has examined thousands of pages of the agencies' internal documents.  Access to this volume of information is nearly impossible for anyone other than a credit reporting agency employee.  This information is not available to the public because of the credit reporting agencies' policies to demand that testimony and documents be placed under protective orders.  In *Kirkpatrick,* Judge Mosman found Mr. Hendricks' knowledge of the internal processes of credit reporting agencies to be a particularly important body of knowledge that would otherwise be kept from the jury.

Moreover, only an expert like Mr. Hendricks can assimilate this huge body of knowledge into a useful context, based on his experience with industry groups and with Congressional hearings on the credit reporting industry.  The *Kirkpatrick* court explicitly recognized this aspect of Mr. Hendricks' experience in ruling that his testimony was admissible and helpful to the jury.

Finally, Mr. Hendricks' has acquired knowledge of the operations of all three of the national credit reporting agencies: Equifax, Experian and Trans Union.  Not even the top management of each agency has this breadth of knowledge because the agencies compete with each other and do not share information on internal policies and procedures.  This knowledge allows Mr. Hendricks to compare the procedures of each agency and learn how one does a better or worse job than the other in complying with the FCRA mandates to assure accuracy, properly respond to consumer disputes and protect consumer privacy.

Equifax cites *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir. 1989).  However, in that case, the Fourth Circuit specifically noted that "it would be incorrect to conclude that Gordon's occupation as a professional expert alone requires exclusion of her testimony . . . ."  878 F.2d at 800.  In *Kline*, the plaintiff offered an expert witness on the issue of

whether the defendant's shift in credit practices was an unjustified discrimination under the Robinson-Patman Act.  The expert apparently had very limited training or experience on the issue before the jury.  She had obtained a business degree approximately seven years prior, and "Her work experience was limited largely to analyses of companies' financial health." *Id.* at 799.

In contrast, Mr. Hendricks' work and experience is focused on the very issues in the case: the practices of Equifax in relation to the requirements of the FCRA.  His work on scores of credit reporting cases has allowed him unique access to confidential policies and procedures. Moreover, his work as an expert witness in FCRA cases is not the sole basis for his qualification. He has also gained experience and expertise through his work with the Social Security Administration, the Federal Trade Commission, both houses of Congress, and as a journalist covering the credit reporting industry.  Numerous courts have admitted Mr. Hendricks to testify as an expert witness over the last decade, and he now has even more experience and expertise.

Equifax also cites *Neal v. CSC Credit Servs., Inc.*, 2004 U.S. Dist. LEXIS 5235 (D. Neb. Mar. 30, 2004).  In that case, the plaintiff attempted to offer as an expert an attorney that spent approximately 50% of his time litigating credit reporting cases.  The court noted that "Being a litigator-advocate does qualify one as an expert."  2004 U.S. Dist. LEXIS 5235, at *3.  That is not the basis for Hendricks' qualifications.  The reasoning in *Neal* is not applicable.

### iv.  The FTC Has Recognized Mr. Hendricks' Expertise.

The FTC is responsible for promulgating regulations and for enforcement of the FCRA. It hired Mr. Hendricks in an action it brought against Accusearch for violation of the FTC Act, involving the privacy of telephone records.  *FTC v. Accusearch, Inc.*, Civ. No. 06-CV-105-D (D. Wyo.).  Accusearch sought to exclude Mr. Hendricks' testimony.  The court denied the motion, finding that Mr. Hendricks was qualified as an expert on the confidentiality of telephone records

and the harms caused by release of those records.  *See* Exhibit 5, attached hereto, at pp. 4-5.

### v.  Congress Has Recognized Mr. Hendricks' Expertise.

Mr. Hendricks has repeatedly testified before both houses of Congress concerning the credit reporting industry and consumer privacy.  In 2003, Mr. Hendricks was one of only six witnesses the Senate Banking Committee invited to testify on proposed amendments to the FCRA, which were later enacted.  At this hearing, Senator Paul S. Sarbanes expounded on Mr. Hendricks' particular expertise.

> Mr. Hendricks was the founder of the *Privacy Times* newsletter, has been its editor for 23 years, and has testified before Congress a number of times on Fair Credit Reporting Act issues.  His expertise has been helpful in the past, and I am sure will continue to be helpful as the committee examines the functioning of the credit reporting system and the ways in which consumer's credit reports are affected.

*See*, *Accuracy of Credit Report Information and the Fair Credit Reporting Act: Hearing Before the U.S. Senate Committee on Banking, Housing and Urban Affairs*, July 10, 2003 (statement of Senator Sarbanes).

That same year, Mr. Hendricks testified three more times before Congress and once for the FTC as it developed amendments to the FCRA.  Some of Mr. Hendricks' recommendations were incorporated into the amendments to the FCRA enacted in 2003.

On March 24, 2010, Mr. Hendricks again appeared before Congress to testify at a hearing before the House Subcommittee on Financial Institutions and Consumer Credit concerning credit reports and credit scores.  Chairman Gutierrez specifically mentioned Mr. Hendricks' testimony in his opening statement.

In 2005, Mr. Hendricks testified three times before Congress on credit reports and related issues.  In June 2006, he testified in a House Energy and Commerce Subcommittee hearing on

"Privacy in the Commercial World II."  In June 2007, he testified at the House Financial Services Committee hearing, "Credit Reports: Consumers' Ability to Dispute and Change Information."  In July 2008, he testified at the only hearing on credit reporting and scoring issues held by Congress that year.

### vi.  Equifax and Experian Have Recognized Mr. Hendricks' Expertise.

Equifax has recognized Mr. Hendricks as an expert on privacy issues.  In its 1990 publication "The Equifax Report on Consumers in the Information Age," Equifax listed Mr. Hendricks as a privacy expert and expressed appreciation for his advice in that report.

Experian has recognized Mr. Hendricks as an expert in the credit reporting field.  In 2002, Experian asked him to serve on its Consumer Advisory Council, which addressed various credit reporting, marketing and privacy-related topics.

### vii. Mr. Hendricks Has Been Recognized as an Expert by the Social Security Administration.

Beginning in 1998, Mr. Hendricks spent several years under contract as a member of the Social Security Administration's Panel of Privacy Experts.  As a panel member, he advised the SSA on a host of issues concerning the confidential nature of the information it maintains.

### d.  Mr. Hendricks' Expert Testimony is Reliable and Will Help the Jury.

### i.  Public Records and Reinvestigations of Consumer Disputes

The concepts of "public records" and "reinvestigations" are not generally understood outside the credit reporting industry.  Yet, these are important subjects in this case.  In his expert report, Mr. Hendricks discusses the significance of public records and court records in the context of credit reporting.  He discusses the specific representations in Equifax's form Letter for responding to public record disputes and the implications of a letter that does not provide accurate information to the consumer about the reinvestigation of a dispute.  He discusses the

Federal Reserve Board study concerning inaccuracy in reporting of court records.   And he discusses the special treatment afforded public record information in the FCRA.   All this testimony is essential for the jury to understand the issues in the case.

In addition, Mr. Hendricks can explain to the jury the meaning of terms like vendor, public record, reinvestigation, serious derogatory, Metro 2 and E-OSCAR.   Without such an explanation, the jury will not be able to understand the testimony of other witnesses and be severely handicapped in judging whether Equifax complied with the FCRA.   These are all technical subjects beyond the knowledge of jurors.

Finally, he can place the actions of Equifax and the specific issues in this case into context for the jury so it is better able to assess whether Equifax complied with the FCRA.

### ii.   Explanation of Credit Reports and Credit Scores

Mr. Hendricks can also provide more general testimony about the nature and purpose of credit reports and credit scores that will provide the jury a useful background for all the issues in this case.   In spite of the proliferation of "free credit report" commercials, the public actually knows very little about the credit reporting industry.   That is because it is highly insular, with three national credit bureaus in tight competition with each other, and each taking strict measures to prevent proprietary information from being disclosed to the public or one another.

Mr. Hendricks' knowledge of the credit reporting industry will provide the jury with an essential background enabling the jury to better understand the facts and issues in the case.

### iii.   FTC Consent Order and Agreement of Assurances with State Attorneys Generals.

Equifax argues that Mr. Hendricks should not be allowed to refer to a Consent Order that Equifax signed with the FTC and an Agreement of Assurances between Equifax and numerous state Attorneys General.   Equifax contends these agreements are not relevant or admissible.   That

is not correct.  These agreements refer to and define the type of court records at issue in this case as "serious derogatory."  They help demonstrate that Equifax was on notice of the importance of accuracy in reporting such records and properly responding to consumer disputes of court records as far back as the early 1990s.

Equifax also overlooks the fact that the agreements do not have to be admissible for Mr. Hendricks to rely on them in forming his opinions.  An expert can rely on facts or data to form an opinion or inference, even if the facts or data are inadmissible, provided they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703.

e.      **Conclusion**

Mr. Hendricks has repeatedly been recognized as an expert qualified to testify in FCRA cases.  His testimony will be helpful to the jury in understanding the evidence presented and determining if Equifax has violated the FCRA.  Plaintiffs respectfully requests that the court deny Equifax's motion to exclude the testimony of Evan Hendricks.

Respectfully submitted,

**FRANCIS & MAILMAN, P.C.**

BY:      _/s/ John Soumilas_

JAMES A. FRANCIS
JOHN SOUMILAS
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

DAVID A. SEARLES
**DONOVAN SEARLES, LLC**
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
(215) 732-6067

ROBERT S. SOLA
**ROBERT S. SOLA, P.C.**
8835 SW Canyon Lane, Suite 130
Portland, OR  97225

Dated: June 1, 2010              (503) 295-6880