**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RICHARD CHAKEJIAN,                       :
BRUCE A. SUMMERFIELD, and          :
TONY LEE WEBB,                               :
                    Plaintiffs,                   :
                                                         :          CIVIL ACTION
            v.                                          :          Nos. 07-2211, 10-3574, 10-3575
                                                         :
                                                         :          CLASS ACTION
EQUIFAX INFORMATION SERVICES,   :
LLC,                                                   :
                    Defendant.                 :

**June _14_ , 2011**                                                      **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

### I.  Introduction

Plaintiffs brought a class action against Defendant Equifax ("Defendant" or "Equifax")

under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* Pending before me are

Plaintiffs' Motion for Final Approval of Class Action Settlement, ECF No. 131, as well as

Plaintiffs' Motion for Award of Attorney's Fees and Costs and Award to Representative

Plaintiffs, ECF No. 132. For the reasons set forth below, I will grant both motions.

### II.  Background

#### A.  *Chakejian* Action

On May 31, 2007, Plaintiff Richard Chakejian ("Chakejian") filed suit against Equifax in

the United States District Court for the Eastern District of Pennsylvania, alleging that Equifax

willfully violated the FCRA by sending inaccurate form letters to those who disputed public

records information in their Equifax credit reports. In January of 2007, Chakejian obtained a

credit report from Equifax and noticed that a record of an involuntary bankruptcy filing appeared there in error. *Chakejian v. Equifax Info. Servs.*, 256 F.R.D. 492, 495 (E.D. Pa. 2009). On January 16, 2007, Chakejian sent Equifax a letter disputing the accuracy of this entry. *Id.* When a customer disputes public record information appearing on a credit report, Equifax employs an independent public records vendor to go to the original source of the information, review the information, and report the results to Equifax. *Id.* On January 26, 2007, Equifax responded to Chakejian that "it contacted each source directly," and indicated that it reviewed Chakejian's "bankruptcy information" and "verified" that the bankruptcy item belonged to him. *Id.* Chakejian claims that Equifax's reinvestigation letter misrepresents the source of Equifax's public records information and misstates the results of its reinvestigation and its reinvestigation procedures in violation of the FCRA. *Id.* at 496.

In the litigation that followed, the parties exchanged thousands of pages of documents produced in discovery and took seven depositions. Mem. Supp. Mot. Final Approval 5, ECF No. 131. On August 18, 2008, Chakejian moved for class certification. On March 25, 2009, I granted that motion and certified the class. On April 29, 2009, the case was stayed pending a decision by the Third Circuit on Defendant's petition for permission to appeal pursuant to Federal Rule of Civil Procedure 23(f). On March 5, 2010, Equifax moved for summary judgment. On June 2, 2010, I denied that motion as stated on the record at the final pretrial conference. On May 24, 2010, both parties filed omnibus motions in limine, which I granted in part and denied in part on June 8, 2010. In the days prior to trial, the parties participated in two full-day mediation sessions with Judge Diane Welsh of JAMS, a private mediation service. *Id.* at 6. Counsel continued to negotiate by phone, in person, and before me as trial began. *Id.* at 6-7. On June 8, 2010,

2

following jury selection and opening argument, but before the first witness testified, the parties agreed on the basic terms of a settlement. *Id.* at 7.

### B. *Summerfield* Action

On March 21, 2008, Plaintiff Bruce Summerfield ("Summerfield") filed a class action complaint against Equifax in the District of New Jersey, alleging that Equifax falsely represents to consumers who have disputed the accuracy of public records information reported about them by Equifax that it has directly contacted the original source of the public records. *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 136 (D.N.J. 2009). Summerfield contends that Equifax reported false information when it issued a credit report stating that he had an outstanding judgment of $1,075 owed to a collection agency on behalf of AT&T. *Id.* On February 22, 2007, Summerfield disputed the record. *Id.* On March 2, 2007, Equifax sent Summerfield a letter indicating that it had contacted the source of the public record, Camden City, and verified that it belonged to Summerfield. *Id.* According to Summerfield, Equifax does not contact the original source of public records, and advises the consumer to take up his dispute with the source, but fails to disclose the true source of consumer public records. *Id.*

On February 2, 2009, Summerfield moved to certify the class. A hearing was held on September 24, 2009, and Judge Rodriguez certified the class on September 30, 2009. Equifax moved for reconsideration on October 15, 2009, but Judge Rodriguez denied that motion on January 4, 2010. Throughout the course of the litigation, the parties filed several discovery-related motions. Following a July 13, 2010 consent motion and a July 20, 2010 consent order, the case was transferred to the Eastern District of Pennsylvania for consolidation with the Chakejian action for settlement purposes.

### C.  *Webb* Action

Finally, on February 26, 2010, Tony Lee Webb ("Webb") filed a class action complaint against Equifax in the Eastern District of Virginia, alleging that Equifax falsely represents the identity of the entity from which it obtains public records in response to consumer disputes. First Am. Compl. ¶ 3, Feb. 26, 2010, ECF No. 3. In July of 2009, Webb disputed a judgment that appeared on his credit report. *Id.* ¶ 14. On August 14, 2009, Equifax responded that it had contacted the source of the inaccurate public record, the Roanoke City General District Court. *Id.* ¶ 15. Equifax also stated that it had verified that the record belonged to Webb. *Id.* However, Webb contends that Defendant never contacted that court, but rather obtained the public record information from an intermediary that resells its database to Equifax. *Id.* ¶¶ 16-17.

In the Webb litigation, the parties briefed a Motion to Change Venue before Webb's claims were severed and transferred to the Eastern District of Pennsylvania on July 16, 2010, to be consolidated with the Chakejian action for settlement purposes.

### D.  Steps Towards Settlement Approval

After Chakejian and Equifax agreed on the basic terms of a settlement on June 8, 2010, and after the Summerfield and Webb actions were transferred to this district in July of 2010, the parties continued to negotiate the details of their agreement. They submitted a settlement for my review on August 31, 2010.

Pursuant to the agreement, Equifax will cease the practice that gave rise to the suit: Equifax will no longer represent that the government, a court, or courthouse is the furnisher of information in response to a consumer's dispute, nor will Equifax represent that the government, a court, or courthouse was contacted directly by Equifax or actually investigated a consumer's

dispute. Mem. Supp. Mot. Final Approval 8.[1] Furthermore, class members will receive eighteen

months of credit monitoring service free of charge. *Id.* at 2, 7.[2] While class members who do not

opt out will be bound by the terms of the settlement with regard to statutory damages under the

FCRA, they retain their rights to bring individual suits against Equifax for any actual damages

sustained. *Id.* at 2.[3] The settlement agreement also provides that Equifax will pay class counsel

$1,075,000, subject to court approval. Mot. Final Approval App. I at 26. Equifax has also

contracted to pay each representative Plaintiff $15,000, again subject to court approval. *Id.* at 27.

On October 21, 2010, I consolidated the *Chakejian*, *Summerfield*, and *Webb* actions and

preliminarily approved the settlement as fair, reasonable, and adequate. Preliminary Approval

---

[1] The agreement states in full that:

> Equifax agrees to change the Consumer Letter at issue in the Actions as follows:
>> (a) Equifax will not represent that the government and/or any court or courthouse is a furnisher of information in response to a consumer's dispute or in Equifax's correspondence to consumers reflecting the results of an investigation or reinvestigation;
>> (b) Equifax will not represent that the government and/or any court or courthouse was contacted "directly" by Equifax in connection with any consumer's dispute;
>> (c) Equifax will not represent that the government and/or any court or courthouse actually investigated a consumer's dispute;
>> (d) Equifax will provide to consumers, with the investigation results, a notice that the consumer may request a description of the reinvestigation process and the contact information of any furnisher contacted by Equifax in that reinvestigation, in accordance with FCRA § 1681i(a)(6)(B)(iii).

Mot. Final Approval App. I at 22-23.

[2] *See also* Mot. Final Approval App. I at 18 ("Equifax will provide each Settlement Class Member eighteen (18) months of Credit Watch Gold, a single bureau credit file monitoring service, or an equivalent product, at no charge to all Settlement Class Members. Credit Watch Gold, or its equivalent product, will include at least the following benefits: (a) daily monitoring of a consumer's Equifax credit file providing alerts for key changes; (b) unlimited access to the consumer's Equifax consumer credit file; (c) free access to the automated fraud alerts feature; and (d) identity theft insurance . . . .").

[3] The exact language reads,

> "On the Effective Date, all Settlement Class Members shall fully and forever release Equifax for all FCRA claims under 15 U.S.C. §§ 1681i(a)(6)(A) and 1681i(a)(6)(B)(iii) relating [to] the language of the letter at issue. Settlement Class Members shall retain their rights to bring claims for actual damages resulting from any credit disputes, inaccuracies, investigations or reinvestigations performed by Equifax in connection with any alleged public records inaccuracies. For example, if a Settlement Class Member believes that he or she has sustained actual damages stemming from an allegedly inaccurate public record reporting on his or her Equifax credit report, that Settlement Class member may bring suit to recover the actual damages allegedly sustained because of the inaccuracy. Plaintiffs agree that the applicable statute of limitations as to such claims has not been tolled during the pendency of the Actions."

Mot. Final Approval App. I at 25-26.

Order ¶¶ 2, 3, Oct. 21, 2010, ECF No. 124. I also provisionally certified a class for settlement

purposes only of:

> All persons in the Commonwealths of Pennsylvania and Virginia and the State of
> New Jersey, who were sent the letter at issue in this litigation by Equifax that
> contained language substantially similar to the letter attached to the complaint
> filed in the Chakejian Action, beginning September 28, 2005 for Pennsylvania
> Class Members, March 21, 2006 for New Jersey Class Members and February 26,
> 2008 for Virginia Class Members through June 6, 2010, seeking statutory
> damages only for an alleged willful violation of 15 U.S.C. § 1681i(a)(6)(B)(iii)
> and 15 U.S.C. § 1681i(a)(6)(A).

*Id.* ¶ 1.[4] I directed that Equifax furnish a list of class members within thirty days. *Id.* ¶ 8. I then

directed that the notice proposed by the parties be sent by the claims administrator via first class

mail to all class members within sixty days. *Id.* I also ordered class counsel to update their

website, www.equifaxclassaction.info, with information about the settlement within thirty days.[5]

*Id.* I found that this method of giving notice fully satisfied the requirements of Federal Rule of

Civil Procedure 23 and due process, and constituted the best notice practicable under the

circumstances. *Id.* ¶ 9. Finally, I scheduled a fairness hearing for March 29, 2011:

1. To finally determine whether this action satisfies the criteria for class certification set
   forth in Federal Rule of Civil Procedure 23(a) and (b);
2. To determine whether the proposed settlement is fair, reasonable and adequate and
   should be granted final approval;

---

[4] The Settlement Agreement defined the class as:

> All persons in the Commonwealths of Pennsylvania and Virginia and the State of New Jersey,
> who were sent the letter at issue in this litigation by Equifax that contained language substantially
> similar to the letter attached to the complaint filed in the Chakejian Action, beginning September
> 28, 2005 for Class members in the Chakejian Action, March 21, 2006 for Class members in the
> Summerfield Action, and February 26, 2008 for Class members in the Webb Action through June
> 6, 2010, seeking statutory damages only for an alleged willful violation of 15 U.S.C. §
> 1681i(a)(6)(B)(iii) and 15 U.S.C. § 1681i(a)(6)(A).

Mot. Final Approval App. I at 16. Thus, in Plaintiffs' motions for preliminary and final approval, the actions are
described by state, whereas in the Settlement Agreement, the actions are described by representative Plaintiff name.
These differences are not material, and the class definitions are the same, but this memorandum specifically
considers and ultimately certifies the class as defined in the Plaintiffs' motions. *See also infra* Part III.A.

[5] The information was to include: 1) the full text of the settlement agreement, 2) class notice, 3) the Preliminary
Approval Order, and 4) contact information for class counsel and the claims administrator. *Id.*

3. To determine whether a final judgment should be entered dismissing the claims of the Class with prejudice;
4. To consider the application of class counsel for an award of attorneys' fees and expenses, and for an individual settlement award to the class representatives;
5. To rule upon other such matters as appropriate.

*Id.* ¶ 7.

The parties involved adhered to the terms of the Preliminary Approval Order.[6] On March 8, 2011, Equifax submitted a Proof of Mailing of Settlement Notice, ECF No. 127; *see also* Preliminary Approval Order ¶ 11.[7] On March 9, 2011, lead class counsel filed a list of all persons who timely opted out of the settlement class. Certification/Declaration of Class Counsel Regarding Opt-Outs, ECF No. 128; *see also* Preliminary Approval Order ¶ 12. Lead class counsel supplemented this list on March 28, 2011. Supplemental Certification/Declaration of Class Counsel Regarding Opt-Outs, ECF No. 134. On March 18, 2011, lead class counsel submitted a list of all persons who timely objected to the settlement. Certification/Declaration of Class Counsel Regarding Objections, ECF No. 130; *see also* Preliminary Approval Order ¶ 14.

In the end, the claims administrator mailed 40,806 notices; 2,282 were returned as undeliverable, but 115 had a forwarding address and were remailed. Proof of Mailing of Settlement Notice ¶ 5. Seven class members requested exclusion from the settlement, and two class members objected. Praecipe to Substitute List of Opt-Outs, ECF No. 135; Certification/Declaration of Class Counsel Regarding Objections. Thomas J. Fieger, Jr.'s objection contained no specificity. Mem. Supp. Mot. Final Approval 17 n.13; Hr'g Tr. 5-7, ECF No. 137. Jeffrey Lichtenstein, on the other hand, submitted a brief letter to the court. Notice of Objection to Settlement, ECF No. 126.

---

[6] On December 20, 2010, I approved the parties' stipulation to grant the claims administrator a six-day extension for the mailing of notice. Stipulation, Dec. 20, 2010, ECF No. 125.
[7] On March 9, 2011, lead class counsel certified that it updated the class settlement website in accordance with the Preliminary Approval Order. Certification/Declaration of Class Counsel Regarding Update and Maintenance of Class Action Website, ECF No. 129.

On March 29, 2011, I held a fairness hearing, during which I received the testimony from Abraham C. Reich on the subject of attorney's fees. No objectors appeared in court.

## III. Discussion

Having reviewed all of the materials submitted by the parties in connection with this settlement, and following the March 29, 2011 final fairness hearing, I will grant Plaintiffs' Motions for Final Approval of Class Action Settlement, and for Award of Attorney's Fees and Costs and Award to Representative Plaintiffs. I will certify the class; find the settlement to be fair, reasonable, and adequate; approve the awards to the attorneys and named Plaintiffs; and enter a final judgment dismissing the case pursuant to the terms of the parties' agreement.

### A.  Class Certification

Plaintiffs ask that I certify the following class:

All persons in the Commonwealths of Pennsylvania and Virginia and the State of New Jersey, who were sent the letter at issue in this litigation by Equifax that contained language substantially similar to the letter attached to the complaint filed in the Chakejian Action, beginning September 28, 2005 for Pennsylvania Class Members, March 21, 2006 for New Jersey Class Members and February 26, 2008 for Virginia Class Members through June 6, 2010, seeking statutory damages only for an alleged willful violation of 15 U.S.C. § 1681i(a)(6)(B)(iii) and 15 U.S.C. § 1681i(a)(6)(A).

To prevail on a motion for class certification, a plaintiff must satisfy all of the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of one of the subsections of Rule 23(b). *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 309 (3d Cir. 1998). The four requirements of Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable [numerosity];
(2) there are questions of law or fact common to the class [commonality];
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a). Plaintiffs seek certification under Rule 23(b)(3), which adds the requirements that "the questions of law or fact common to class members predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority]." Fed. R. Civ. P. 23(b)(3).

### 1.   Rule 23(a) Requirements

#### a.   Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all its members is impracticable. The Third Circuit has written that the numerosity requirement will generally be satisfied "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). This class numbers nearly 40,000 individuals. Proof of Mailing of Settlement Notice, ECF No. 127. Moreover, as a practical matter, if the *Chakejian* and *Summerfield* actions met the numerosity requirement in their own right, then the *Chakejian*, *Summerfield*, and *Webb* actions meet the numerosity requirement once consolidated. Thus I find Rule 23's numerosity requirement to be satisfied in this instance.

#### b.   Commonality

Rule 23(a)(2) requires the existence of questions of law or fact common to the class. The Third Circuit has stated that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). As I have previously written, and as remains the case in this now-consolidated action, the factual and legal basis of the claim is common to all

Plaintiffs; Plaintiffs allege that the standard reinvestigation letter that Equifax sent to prospective class members in response to a dispute over public record information contains misstatements and misrepresentations in violation of the FCRA. *Chakejian*, 256 F.R.D. at 498. Thus, Rule 23(a)(2) is satisfied.

### c.   Typicality

The typicality requirement of Rule 23(a)(3) assesses whether the interests of the class representatives are "typical of the class as a whole" and are aligned with the interests of the rest of the class "so that the [class representatives] will work to benefit the entire class through the pursuit of their own goals." *In re Prudential*, 148 F.3d at 311. The typicality requirement does not mandate "that all putative class members share identical claims," *id.* (quotation omitted), but rather will be deemed met if the claims arise "from the same event or practice or course of conduct" and are "based on the same legal theory," *Baby Neal*, 43 F.3d at 58. In this case, each class member received a letter from Equifax in response to a customer dispute over public record information, in which Equifax allegedly failed to disclose the source of their public record information and misrepresented its reinvestigation procedures in violation of the FCRA. The claims of Chakejian, Summerfield, Webb, and each of the prospective class members arise from the same course of conduct, and are based on the same theory of liability. *See Chakejian*, 256 F.R.D. at 498. In other words, the named Plaintiffs' claims are typical and aligned with the interests of the rest of the class. Therefore, I find that the Rule 23(a)(3) requirement is satisfied.

### d.   Adequacy

Adequate representation requires a two-pronged analysis: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the

plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). I have previously found that the attorneys who represent Plaintiffs are experienced in class action litigation, including class actions under the FCRA and other consumer protection laws, and are well qualified to conduct the proposed litigation. *Chakejian*, 256 F.R.D. at 498. I have similarly previously found that Chakejian does not have an interest antagonistic to the interests of the class. *Id.* Likewise, Judge Rodriguez has held that Summerfield is an adequate class representative. Webb too meets the requirements; the parties have indicated that he is similarly situated to Chakejian and Summerfield, and there is therefore no reason to believe that he has any interests antagonistic to those of the class.[8] Finally, the parties have submitted that none of the named Plaintiffs have interests that are antagonistic to those of the class, and that they are unaware of any actual or apparent conflicts of interests between the named Plaintiffs and the class. Mem. Supp. Mot. Final Approval 12. The adequacy requirement of Rule 23(a)(4) is thus also satisfied.

### 2.      Rule 23(b)(3) Requirements

#### a.  Predominance

The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310-11 (3d Cir. 2008) (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997)), and requires that "[i]ssues common to the class . . . predominate over individual issues," *In re Prudential*, 148 F.3d at 313-14. "[P]redominance is normally satisfied

---

[8] *See* Mem. Supp. Mot. Preliminary Approval 7, ECF No. 123 ("Additionally, the *Webb* matter, originally filed in the Eastern District of Virginia and transferred to the Eastern District of Pennsylvania on July 16, 2010, consists of consumers with identical claims arising from the same form letters described in the *Chakejian* and *Summerfield* class definitions."); *see also id.* at 15 ("All three class actions in this matter are premised upon the same letter, issued by the same Defendant, under the same circumstances of investigation or reinvestigation of a disputed public record. The *Chakejian*, *Summerfield* and *Webb* actions all involve not only common, but identical, questions of law and fact.").

when plaintiffs have alleged a common course of conduct on the part of the defendant." *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 113 (E.D. Pa. 2005) (citing *In re Prudential*, 148 F.3d at 314-15); *accord Bonett v. Ed. Debt Servs., Inc.*, No. 01-6528, 2003 U.S. Dist. LEXIS 9757, at *12 (E.D. Pa. May 9, 2003) ("Predominance is readily satisfied, where the core claims asserted by each Class member all arise out of the same transaction or occurrence—the receipt of debt collection letter(s) from the Defendants."). In this case, as both Judge Rodriguez and myself have previously found, considerations of willfulness and damages do not result in the predominance of individual issues. *Summerfield*, 264 F.R.D. at 142-43; *Chakejian*, 256 F.R.D. at 500-01. Rather, Plaintiffs were all exposed to the same policy or practice of Defendant. "Thus, the claim [focuses] on Defendant's policies and procedures with respect to issuing reinvestigation letters," and "[n]othing about Plaintiffs' behavior or conduct impacts the case; it is Defendant's actions that are judged." *Summerfield*, 264 F.R.D. at 142-43. Moreover, "[g]iven the nature of [Plaintiffs'] claims, this is not a case in which the amount of the damage award is likely to differ from consumer to consumer, particularly in view of the [Plaintiffs'] decision not to pursue actual damages." *Chakejian*, 265 F.R.D. at 501. As a result, common issues predominate, and this class is sufficiently cohesive to warrant adjudication by representation.

### b.  Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In determining whether a class action is superior to other methods, the district court must "'balance, in terms of fairness and efficiency, the merits of a class action'" against the merits of alternative methods of adjudication. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 309 (3d Cir. 2005) (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996)). The superiority requirement is satisfied here for at least

two reasons. First, the statutory claims of each plaintiff are relatively small, with the result that individuals may lack the incentive to bring suit. However, the class action device remedies this imbalance. *See Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (quotation omitted)). Second, a class action in this case prevents the filing of thousands of separate law suits raising the same factual and legal issues and contributes to the more efficient administration of justice. *See generally Chakejian*, 256 F.R.D. at 501-02.

In conclusion, the class satisfies all of the relevant Rule 23 criteria, and will be finally certified.[9]

### B.  Settlement Approval

Plaintiffs also seek final approval of their settlement with Equifax.

According to Federal Rule of Civil Procedure 23(e), "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." In other words, "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.'" *In re Prudential*, 148 F.3d at 316 (quoting *In re G.M. Trucks Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

In the Third Circuit, fairness, adequacy, and reasonableness of a class action settlement are assessed according to the factors listed in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and ellipses omitted):

---

[9] The settlement class shall not include those who have already settled or otherwise compromised their claims against Equifax, or those who have opted out. *See* Mot. Final Approval App. I at 16.

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

The Third Circuit later suggested an expansion of these factors when appropriate to include other

considerations such as:

the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential*, 148 F.3d at 323; *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350

(3d Cir. 2010). District courts "must make findings as to each of the *Girsh* factors, and the

*Prudential* factors where appropriate," and "cannot substitute the parties' assurances or

conclusory statements for [their] independent analysis of the settlement terms." *In re Pet Food*,

629 F.3d at 350-51.

In this case, the *Girsh* factors and relevant *Prudential* considerations weigh in favor of

settlement approval.

**1.      The Complexity, Expense, and Likely Duration of the Litigation**

If these cases were to proceed to trial, the litigation would be lengthy. *Chakejian* reached

the trial stage of litigation, but the trial itself was likely to present challenges for Plaintiffs.

Although the underlying factual pattern is not particularly complex, Chakejian would have to prove willfulness at trial, a high hurdle to clear. *See Reibstein v. Rite Aid Corp.*, No. 09-2734, 2011 U.S. Dist. LEXIS 5285, at *22 (E.D. Pa. Jan. 19, 2011) (citing *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56-57 (2007)). Furthermore, the procedural history of the *Chakejian* case to date is indicative of the complexity, expense, and duration that the other actions would entail going forward. Chakejian filed his complaint in May of 2007, moved for class certification in August of 2008, and commenced trial in June of 2010. Along the way, there were motions to compel and attempted appeals, and thousands of pages of documents exchanged in discovery. Much of this would be repeated in the other actions. The *Summerfield* case only recently reached the certification stage, and the *Webb* action did not progress far past the complaint. Thus much discovery would remain, likely with attendant motions to compel; a new class would confront certification, likely with attendant appeals; and there would be renewed efforts to obtain summary judgment. These proceedings would likely involve thousands of dollars and years of litigation. Thus this factor counsels in favor of settlement approval, as private resolution of the parties' conflict avoids such expense and delay.

### 2.        The Reaction of the Class to the Settlement

On the whole, the class reacted favorably to the settlement. "Courts have generally assumed that 'silence constitutes tacit consent to the agreement.'" *In re G.M.*, 55 F.3d at 812 (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)). In this litigation, out of approximately forty thousand class members, only seven opted out, and only two objected. Seven opt outs and two objectors in a class of nearly forty thousand represents a small number that weighs in favor of this settlement. *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (finding settlement strongly favored even when there were 29 objectors in a class

15

of 281 members); *Stoner v. CBA Info. Servs.*, 352 F. Supp. 2d 549, 552 (E.D. Pa. 2005) (noting a "more than favorable class reaction" in the face of 5 objections, 18 opt-outs, and a 11,980-person class).

Moreover, the only objection with substance does not undermine the settlement.[10] Jeffrey Lichtenstein wrote to the Court on January 2, 2011 that Defendants had "propounded substantial harm to [him] financially." Notice of Objection to Settlement, ECF No. 126. He continued, "A more appropriate settlement should offer the members some sort of mechanism to force the defendant to remove the disputed items that they have apparently defrauded the class members that they claimed to verify." *Id.* However, as Plaintiffs argue in their briefs, the claims in their lawsuits "only concerned the representations contained within the disclosures that Equifax made to consumers, not how it handled credit disputes." Mem. Supp. Mot. Final Approval 17 n.3. Therefore, the concerns raised by Mr. Lichtenstein were "never sought to be remedied by this class action" and have not been waived. Hr'g Tr. 4. Moreover, the settlement agreement provides that class members retain their rights to bring claims for actual damages,[11] and thus does not deprive Mr. Lichtenstein of the right to seek recovery from Equifax for his substantial financial harm in a separate suit.[12] Finally, there *is* a mechanism to force Equifax to remove disputed items

---

[10] One objection contained no specificity. Mr. Francis stated at the final fairness hearing that he "received a letter from a Sharon Sherry who is a lawyer who said that [Thomas Fieger, Jr.] objected to the settlement and at the same time, he also wishes to be excluded from the settlement." Hr'g Tr. 6, ECF No. 137. Mr. Francis continued that "there was no specificity at all" to the objection. *Id.* Mr. Fieger had a time frame to explain the basis for his objection but failed to do so. *Id.*; *see also* Mot. Final Approval App. I Ex. A at 7. Nevertheless, I requested that Mr. Francis send Ms. Sherry a copy of the transcript. Hr'g Tr. 6.

[11] *See supra* note 3.

[12] As Mr. Francis explained at the final fairness hearing, "Mr. Lichtenstein's objection is misplaced for the simple reason that his ability to bring an actual damages lawsuit against Equifax for a credit report inaccuracy or failed investigations is in no way impacted by this settlement, specifically, and one of the things that I am very proud of in this settlement that we held out until the end, as Your Honor may recall when we were here back in June, is each class member here is not giving up any right or waiving any claim to sue Equifax for any actual damages [that] he or she may have that relate to a credit report inaccuracy or a public records inaccuracy or a failed investigation—the types of individual cases that this Court's aware of. So his claim is not impacted at all. That situation was never sought to be remedied by this class action and it's not waived. He can still bring that case." Hr'g Tr. 4; *see also id.* at

that they claimed to verify from consumers' credit reports: the FCRA provides a comprehensive reinvestigation regime, up to and including private suits in courts of law, to force credit reporting agencies to remedy such errors and atone for such misrepresentations. *See* 15 U.S.C. §§ 1681i, 1681o.[13] For all of these reasons, Mr. Lichtenstein's concerns do not destabilize the parties' agreement.

In sum, there were very few opt outs, and even fewer objectors. Furthermore, the objections are without merit. As a result, the reaction of the class to settlement counsels in favor of settlement approval.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

These proceedings advanced to a sufficiently late stage prior to settlement that the third *Girsch* factor also weighs in favor of approval. The Third Circuit has explained the logic behind this prong as follows:

> The parties must have an "adequate appreciation of the merits of the case before negotiating." To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

*In re Prudential*, 148 F.3d at 319 (quoting *In re G.M.*, 55 F.3d at 813). The proceedings advanced to a very late stage in this case, and much discovery was completed. After over three years of discovery and motions practice, including a contested and appealed motion for class certification, the *Chakejian* case advanced to trial. A jury was empanelled and opening arguments were delivered before the terms of this settlement were agreed upon. There were also multiple and rigorous negotiation sessions that took place around the time of trial, which

---

7. Mr. Francis then agreed to send Mr. Lichtenstein a transcript of the proceeding, complete with his explanation as to why Mr. Lichtenstein's objection to the settlement was misplaced. *Id*. at 4-5.

[13] *See* Hr'g Tr. 7.

constitute further evidence that this settlement represents an informed resolution of the case. In the end, the parties had ample opportunity to exchange documents, depose witnesses, and identify the strengths and weaknesses of their positions. *See, e.g.*, *Reibstein*, 2011 U.S. Dist. LEXIS 5285, at \*24; *Bonett*, 2003 U.S. Dist. LEXIS 9757, at \*6.  For all of these reasons, I find that this factor weighs in favor of the settlement agreement.

### 4.        The Risks of Establishing Liability

Plaintiffs would face a not insubstantial risk in establishing liability were this case to go to trial. Plaintiffs allege that Equifax willfully violated the FCRA, a standard which requires a demonstration that Equifax's behavior was knowing or reckless. *Safeco*, 551 U.S. at 56-57. Equifax has forcefully maintained that its actions were not willful, and thus Plaintiffs would face the heavy burden of proving knowledge or recklessness at trial. Although Plaintiffs were prepared to present their evidence on this point, settlement nevertheless avoids a real risk that Equifax would not be found liable. Thus this *Girsch* factor also indicates that the parties' settlement should be approved.

### 5.        The Risks of Establishing Damages

The risks of establishing damages are closely tied to the risks of establishing liability, and here again, there are considerations that weigh in favor of settlement. First, for the reasons stated above, it is not a foregone conclusion that Plaintiffs would obtain a verdict against Defendants and find themselves entitled to damages. Second, Plaintiffs are seeking statutory damages in the range of $100 to $1,000 per class member, or approximately $4,151,000 to $41,510,000 for the class.[14] Plaintiff has submitted an expert report valuing actual class recovery pursuant to the

---

[14] In their papers, Plaintiffs base their numerical estimates on a 41,510-member class. *See* Mem. Supp. Mot. Final Approval 3. However, slightly fewer than 40,000 notices were successfully mailed. *See* Proof of Mailing of

settlement at $9,675,981. Mot. Final Approval App. II at 4. Thus, Plaintiffs are recovering significantly more than the low end of the damages range. Furthermore, this figure does not capture the benefit to the class members and others from Equifax's commitment to alter its reinvestigation letters; Plaintiffs submit that this gain to the class can be quantified in the sum of $3,320,800.[15] *Id.* at 3-4. Thus even if Equifax were to be found liable, and Plaintiffs were awarded some damages, that figure could be as low as $4,151,000. Here, Plaintiffs are recovering $12,996,781 worth of benefits.[16] The risk of no or a lower damages award at trial indicates the favorability of this settlement agreement.

### 6.      The Risks of Maintaining the Class Action Through the Trial

Under this factor as well, there are risks that weigh in favor of settlement. First, the *Webb* class had not yet been certified prior to settlement; thus in the absence of the agreement, there are certainly risks that Webb's efforts to proceed as a class action would fail. Furthermore, "[u]nder Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Prudential*, 148 F.3d at 321 (citing *In re School Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir. 1986); *In re G.M.*, 55 F.3d at 815). If the *Chakejian*, *Summerfield*, and *Webb* cases were to remain consolidated in the Eastern District of Pennsylvania and proceed to trial, there is a possibility that manageability problems would arise,

Settlement Notice ¶ 5. For ease of analysis, and because the difference is not great, Plaintiffs' estimates based on the 41,510-member class will be retained in the discussion that follows.
[15] Plaintiffs explain that they "have also secured substantive and widespread changes to Defendant's practices, whereby Defendant will not identify the court house originating the public record in response to a consumer's inquiry as to the source of the information on their credit report. Defendant's practice previously cost consumers hours of time and aggravation during business hours when consumer's [sic] traveled to the court house which Defendant alleged it had communicated with about the public records. Consumers also were required to pay for the records, and then, submit the same records to Defendant in the form of an additional dispute, costing additional time and mailing costs." Mem. Supp. Mot. Final Approval 20.
[16] This figure appears as $12,996,181 in certain of Plaintiffs' papers. *See, e.g.*, Mem. Supp. Mot. Final Approval 19. However, adding the various sums appearing in Plaintiffs' expert report gives a total of $12,996,781. Mot. Final Approval App. II at 3-4.

perhaps due to the fact that the Plaintiffs reside in three different states, for example. Finally, I note that the Third Circuit has commented that "the manageability inquiry in settlement-only class actions may not be significant." *Id.* In sum, to the extent that this factor merits consideration in this context, there are risks regarding the continued existence of a class or classes, and there are advantages to settlement for that reason.

### 7.       The Ability of the Defendants to Withstand a Greater Judgment

This factor is neutral. The ability of the defendants to withstand a greater judgment has been found a particularly relevant consideration "where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein*, 2011 U.S. Dist. LEXIS 5282, at *30. In many other cases, "courts in this district regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." *Bredbenner*, No. 09-905, 2011 U.S. Dist. LEXIS 38663, at *42 (E.D. Pa. Apr. 8, 2011). There is no evidence on record as to Equifax's financial circumstances. Thus, this does not appear to be a case where the defendant's finances are poor and the settlement is limited as a result, such that this factor must be analyzed at length in deciding whether or not to approve of the agreement at hand. Rather, this factor is neutral, as in many other cases. Equifax may be able to pay a greater amount, but the recovery to Plaintiffs still appears to be fair. Thus the seventh *Girsch* factor neither supports nor undercuts the parties' settlement.

### 8.       The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

These last two *Girsch* factors, often analyzed in conjunction, confirm that the parties' settlement is to be approved. Here, each class member's recovery "'exceeds the value of the best

possible recovery discounted by the risks of litigation.'" *Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *42 (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 540 (D.N.J. 1997)). As previously stated, this class could potentially recover a maximum of $41,510,000. Their award instead carries a value of $12,996,781. Thus, Plaintiffs' recovery represents over 30% of the maximum possible recovery. I have previously found a 15% recovery to be reasonable. *In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 489-90 (E.D. Pa. 2003). Furthermore, given that Equifax has continued to vigorously deny Plaintiffs' allegations, and that Plaintiffs would have to prove willfulness at trial, litigation carries several risks which make a $12 million recovery seem appropriate in spite of a $40 million maximum. Finally, this settlement offers an immediate benefit, whereas litigation would prolong resolution of this controversy, particularly in the event of likely appeals.[17]

### 9.    *Prudential* Considerations

The relevant *Prudential* factors also indicate that this settlement should be approved. The underlying substantive issues are mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken. Moreover, not only can class

---

[17] Non-monetary awards "deserve careful scrutiny to ensure that these provisions have actual value to the class." Fed. R. Civ. P. 23 advisory committee note. As an additional consideration, the Class Action Fairness Act of 2005 (CAFA) requires heightened judicial scrutiny of coupon settlements. *See* 28 U.S.C. § 1712 (2006).  "Although Congress did not define the term 'coupon' in the statute, courts have generally considered a coupon settlement to be one that provides benefits to class members in the form of a discount towards the future purchase of a product or service offered by the defendant." *Radosti v. Envision Emi, LLC*, 717 F. Supp. 2d 37, 55 (D.D.C. 2010). I do not find this case to present a coupon settlement, as class members do not have to purchase a product in order to obtain a benefit. *See Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("[P]re-paid envelopes are not identical to coupons, since they represent an entire product, not just a discount on a proposed purchase."). However, CAFA's call for heightened scrutiny is nevertheless instructive. *See Fleury v. Richemont N. Am., Inc.*, No. 05-4525, 2008 U.S. Dist. LEXIS 112459, at *11 (N.D. Cal. Aug. 6, 2008) ("[E]ven if the instant case did not involve any coupons such that CAFA would not apply, courts have still found the above CAFA provision instructive when the benefit to the class is coupon-like.") Considering this extra level of review, I still find that the final *Girsch* factors counsel in favor of the parties' settlement. First, this non-monetary relief is even more favorable than similar forms of non-monetary relief approved in similar cases. *See, e.g.*, Final Judgment Approving Settlement at 5, Gillespie v. Equifax Info. Servs., No. 05-0138 (N.D. Ill. Dec. 18, 2009), ECF No. 218 (six months of credit monitoring service). Second, non-monetary relief may not be a class member's only compensation, as the settlement agreement provides for the retention of rights to bring claims for actual damages.

members opt out of the settlement, but class members were not asked to waive their rights to

bring suit against Equifax for actual damages. The process by which class members can claim

their recovery is fair, and, as will be explained below, the attorney's fees requested are

reasonable. Finally, it bears repeating that the settlement agreement brings about sought-after

changes in Equifax's practices that will affect many consumers.

In conclusion, this settlement is fair, adequate, and reasonable. Such a finding is further

bolstered by previous court decisions approving similar settlements whose terms were somewhat

less favorable than these. *See* Final Judgment Approving Settlement at 5, Gillespie v. Equifax

Info. Servs., No. 05-0138 (N.D. Ill. Dec. 18, 2009), ECF No. 218 (six months of credit

monitoring service). For all of these reasons, I will grant final approval of its terms.

### C.  Attorney's Fees and Costs

Plaintiffs request attorney's fees and costs of $1,075,000 in this case.

Federal Rule of Civil Procedure 23(h) provides, "In a certified class action, the court may

award reasonable attorney's fees and nontaxable costs that are authorized by law or by the

parties' agreement." The Fair Credit Reporting Act is one such law that authorizes the award of

attorney's fees, *see* 15 U.S.C. § 1681n(a)(3), and Equifax has agreed to play Plaintiffs' counsel

$1,075,000, Mot. Final Approval App. I at 26. However, "a thorough judicial review of fee

applications is required in all class action settlements." *In re Prudential*, 148 F.3d at 333

(quoting *In re G.M.*, 55 F.3d at 819).

There are two methods according to which courts review attorneys' fee requests—the

lodestar method and the percentage-of-recovery method. *Id.* "The lodestar method is more

commonly applied in statutory fee-shifting cases, and is designed to reward counsel for

undertaking socially beneficial litigation in cases where the expected relief has a small enough

monetary value that a percentage-of-recovery method would provide inadequate compensation. It may also be applied in cases where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method." *Id.* "The percentage-of-recovery method is generally favored in cases involving a common fund . . . ." *Id.* "Regardless of the method chosen, . . . it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).[18]

This case presents a statutory fee-shifting case, and therefore the lodestar method is appropriate. *See Reibstein*, 2011 U.S. Dist. LEXIS 5285, at *46 ("[B]ecause the damages provision of the FCRA includes such a mechanism for attorneys [sic] fees, courts evaluating attorneys' fees following settlements of FCRA actions have often employed the lodestar method." (citing *Barel v. Bank of Am.*, 255 F.R.D. 393, 403 (E.D. Pa. 2009); and *Perry*, 255 F.R.D. at 120-21)). However, the percentage-of-recovery method is also relevant as a cross-check. *See id.* at *46-47.

### 1.      Lodestar

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid*, 396 F.3d at 305.

### a.  Hourly Rate

"Whether the rate charged is reasonable is determined by 'assessing the experience and skill of the prevailing party's attorneys and by looking at the market rates in the relevant

---

[18] "Neither method is mandatory, leaving the district court with a wide range of discretion when selecting which method to employ." *Perry*, 229 F.R.D. at 119.

community for lawyers of reasonably comparable skill, experience and reputation.'" *Reibstein*, 2011 U.S. Dist. LEXIS 5285, at *44-45 (quoting *Perry*, 229 F.R.D. at 119).

In this case, there are three law firms seeking fees. Francis & Mailman, P.C., seeks to charge rates from $125 for paralegals to $485 for partners. Francis Decl. ¶ 7, ECF No. 132. Donovan Searles, LLC, seeks to charge rates from $175 for paralegals to $700 for partners. Searles Decl. ¶ 5, ECF No. 132. Robert S. Sola, P.C., seeks to charge a rate of $550 per hour. Sola Decl. ¶ 3, ECF No. 132. The Court has carefully reviewed the documentation in support of these fees, including Plaintiffs' motion, counsel's affidavits and time sheets, an expert report, and certifications from other attorneys. The lawyers and staff members of all three firms are deeply experienced in consumer class action litigation, and their skill has been recognized by many other courts. *See* Francis Decl. Ex. E; Searles Decl. Ex. C; Sola Decl. ¶ 5; *see also, e.g.*, *Perry*, 229 F.R.D. at 121-22. Moreover, their rates are comparable to those of other lawyers in the community with similar skill and experience; each firm submitted expert opinions or declarations from other attorneys to this effect, and Francis & Mailman's expert, Abraham C. Reich, testified in defense of that firm's fees at the final fairness hearing.[19] *See* Francis Decl. Ex. B; Searles Decl. Ex. D; Sola Decl. Ex. B; Hr'g Tr. 10-13. Finally, the firms stated that they charged the same rates in this case as in "other contingent matters and in class action litigation," Searles Decl. ¶ 4, or generally to "clients who retain the firm," Francis Decl. ¶ 4. In light of all of this evidence, I find each hourly rate proposed to be reasonable. *See also Reibstein*, 2011 U.S. Dist. LEXIS 5258, at *47-48 (finding reasonable rates of $650 for partners and $175-$225 for

---

[19] Mr. Reich concluded that Francis & Mailman could reasonably charge rates from $125 per hour for paralegals to $525 per hour for Mr. Francis and Mr. Mailman. Francis Decl. Ex. B at 10.

paralegals); *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 422 (E.D. Pa. 2010) (finding reasonable rates of $650 for partners and $125-$225 for paralegals).[20]

### b.  Number of Hours

The reasonable hours prong requires both that counsel not spend excessive time on a case and that counsel not use "'highly priced talent for matters easily delegable to non-professional or less experienced associates.'" *Id.* (quoting *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983)).

Here, Francis & Mailman spent 2,380.3 hours on the case, Francis Decl. ¶ 7, Donovan Searles spent 445.9, Searles Decl. ¶ 5, and Robert S. Sola spent 98.4, Sola Decl. ¶ 4. The record indicates that these time expenditures were reasonable. Francis & Mailman was involved from the early stages of litigation, and acted as lead class counsel for Plaintiffs and the class. *See* Francis Decl. ¶ 2. Furthermore, Francis & Mailman delegated matters to attorneys and other staff members with lower billing rates, and eliminated time considered to be duplicative or redundant from its time sheets. *Id.* ¶ 3. Similarly, Donovan Searles was involved from an early date and actively involved in the litigation. *See* Searles Decl. ¶ 2. Sola joined the litigation to assist in trial preparation, a task that reasonably required his ninety-eight hours of work. To the extent that all of these firms employed the services of partners rather than associates or paralegals, such

---

[20] Mr. Donovan charges an hourly rate of $700. Other cases cited by the parties approve hourly rates for Donovan Searles of up to $650 only, and Donovan Searles does not specifically explain or defend the $50 increase for Mr. Donovan in this instance. However, in those cases cited by the parties, courts often applied multipliers to the lodestar; in this case, Plaintiffs' counsel is seeking fees below the lodestar. Furthermore, Mr. Reich's report references the experience of Donovan Searles. Francis Decl. Ex. B at 7. Mr. Reich also points out that the 2010 National Law Journal Billing Survey listed rates of up to $880 per hour for partners in Philadelphia law firms, and cites the Laffey Matrix as identifying a $709 per hour billing rate for attorneys with twenty or more years of experience. *Id.* Finally, Donovan Searles submitted "A Nationwide Sampling of Law Firm Billing Rates" from *The National Law Journal*, wherein it appears that several Philadelphia law firms charge in excess of $700 per hour for partners. Searles Decl. Ex. E. Thus Donovan Searles could have more forcefully defended its highest hourly rate, but the evidence on record provides support for the $700 figure for purposes of calculating the lodestar, particularly when the attorneys are requesting fees below the lodestar in the end.

decisions appear to have been reasonable, particularly in light of the novelty of the theory of the case. In sum, as with counsel's hourly rates, the hours spent in this litigation were reasonable.

### c.   Calculation and Conclusions

As stated above, calculation of the lodestar requires multiplication of the hours reasonably worked by the reasonable billing rates. These equations result in a lodestar for Francis & Mailman of $948,354, for Donovan Searles of $262,405, and for Robert S. Sola of $54,120. The total attorney's fees are $1,264,879. Furthermore, counsel have carefully documented expenses incurred for filing, postage, travel, research, and copying, totaling in excess of $60,000. However, Plaintiffs' counsel is only requesting a sum of $1,075,000 in attorney's fees and costs. Therefore, there is no need to discuss multipliers and the appropriateness of an increase to the lodestar. Rather, the provision for attorneys' fees and costs as laid out in the settlement agreement is eminently reasonable, judging from the lodestar, and I would approve the award on those grounds.

### 2.        Common Fund

The percentage-of-recovery analysis should also cross-check the lodestar calculation.

In a common fund case, the Third Circuit has identified ten factors to consider to assess the reasonableness of an attorney's fees award. These include:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated

had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir. 2000); *In re Prudential*, 148 F.3d at 336-40). These factors are not exhaustive, and a district court should consider "'any other factors that are useful and relevant with respect to the particular facts of the case.'" *In re Diet Drugs*, 582 F.3d at 541 n.34 (quoting *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 166 (3d Cir. 2006)). In this case, the services provided to class members have been valued at $9,675,981, the changes made by Equifax have been estimated to represent a $3,320,800 gain to class members, for an aggregate settlement value of $12,996,781, and the attorneys are seeking $1,075,000 in recovery. Mot. Final Approval App. II at 3-4. Thus, counsel's award would represent 11% of the value received by class members in services, and 8.3% of the value received by class members in services and changes made by Equifax.

### a.   The Size of the Fund Created and the Number of Persons Benefitted

This factor weighs in favor of the fee award. The fund created is worth nearly $13,000,000, and is intended to benefit a class of approximately 40,000 people.

### b.   The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

This factor also weighs in favor of the fee award. "The absence of large numbers of objections mitigates against reducing fee awards." *In re Cendant Corp.*, 232 F. Supp. 2d 327, 337 (D.N.J. 2002). Here, out of nearly 40,000 class members, there were only two objections, and only one contained any substance. Moreover, that objection lacks merit. Mr. Lichtenstein

complained that the attorneys would be receiving "over $1Million dollars" while "the members of the class action are offered some worthless credit monitoring services that no one wants." Notice of Objection to Settlement, ECF No. 126. However, the credit monitoring service is not worthless, and rather represents a value of $233.10 to each consumer. Mot. Final Approval App. II at 4. Furthermore, class counsel has successfully negotiated a settlement whereby Equifax will change its practices going forward, saving class members and future consumers considerable time and expense. Mr. Lichtenstein also complains that the settlement should include a mechanism by which he can force changes to his credit report and recover actual damages for harm suffered. However, as set forth above, such a mechanism exists. Thus, Mr. Lichtenstein's concerns have already been addressed, and there are no other objections. I therefore find that the second *Gunter* factor also supports the attorneys' fees requested.

### c.   The Skill and Efficiency of the Attorneys Involved

The attorneys in this case were skilled and efficient and merit 11% of the value of the fund in fees. "The skill and efficiency of class counsel is measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *56 (quotations omitted). As discussed above, class counsel are highly skilled and experienced in consumer class actions. *See* Francis Decl. Ex. E; Searles Decl. Ex. C; Sola Decl ¶ 5. They faced many challenges in the course of three years of litigation but achieved a favorable result for class members in the end. Opposing counsel was similarly well qualified, and all attorneys exhibited professionalism. These considerations also weigh in favor of the fees requested.

28

### d.   The Complexity and Duration of the Litigation

This litigation has been sufficiently complex and lengthy to support $1,075,000 in

attorneys' fees. The *Chakejian* litigation began over three years ago, and surviving summary

judgment required the presentation and adoption of a relatively untested legal theory. Mem.

Supp. Mot. Final Approval 2-3.

### e.   The Risk of Nonpayment

There was some risk of nonpayment for the attorneys in this litigation. "Courts consider

the risk of non-payment in light of the Defendant's ability to satisfy an adverse judgment, or the

risk of establishing liability at trial." *Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *58 ("[C]lass

counsel faces a risk of non-payment due to the difficulty of establishing liability at trial. Class

counsel has prosecuted this case on a contingent basis, with no retainer.") (citations omitted). As

previously stated, Plaintiffs in this case would have to prove willfulness at trial. Because of the

risk that they may not be able to do so, and the fact that Plaintiffs' counsel was operating on a

contingent basis, this consideration also indicates that substantial attorney's fees should be

awarded with settlement approval. (To the extent that there is no evidence of record regarding

Equifax's ability to satisfy the judgment, this factor is neutral.)

### f.   The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Plaintiffs' counsel spent significant, but not excessive, time on this case. As previously

detailed, this litigation began over three years ago, Plaintiffs prevailed through several motions

and appeals, and both sides progressed through discovery. At the same time, there is no

indication that Plaintiffs' counsel delayed any stage of the proceedings. Rather, two of the three

29

cases now joined in litigation will achieve resolution in their early stages due to the efforts of

counsel in this case. For these reasons, this factor too points toward approval of the attorney's

fees requested.

### g.   The Awards in Similar Cases

The award in this case is less than awards in similar cases. "In common fund cases, fee

awards generally range anywhere from nineteen percent (19%) to forty-five percent (45%) of the

settlement fund." *Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *59 (citing *In re G.M.*, 55 F.3d

at 822; *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990)). As

stated above, the fee award requested here represents either 8.3% or 11% of class recovery. This

percentage is certainly not excessive or unreasonable, and this factor weighs in favor of approval

of Plaintiffs' attorney's fees request.

### h.   The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups

All of the benefits obtained for class members are due to the efforts of class counsel;

there were no government agencies or other groups conducting investigations and contributing to

this settlement. Mem. Supp. Mot. for Award of Attorney's Fees 12, ECF No. 132. Therefore, this

factor supports a substantial fee award for class counsel.

### i.   The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel Was Retained

Plaintiffs assert that this consideration is a non-factor in this case. By way of further

explanation, in a common fund case, where attorneys will take their fees from the fund, the

contingency fee comparison is apt. In this case, the settlement agreement bestows an aggregated

value on the class and is similar to a common fund in that sense. However, Equifax has agreed to

30

pay attorney's fees separately, and thus there is no percentage reduction to any fund. Therefore, the attorney's fees requested in this case bear little similarity to contingency fees. To the extent that this factor is still relevant for purposes of numerical comparison, it may be added that contingency fees representing 30% to 40% of recovery are fairly typical. *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (citing cases). Here, class counsel's request for attorney's fees equivalent to 11% of benefits obtained for the class is comparatively very reasonable.

### j.   Any Innovative Terms of Settlement

The settlement achieved is innovative in at least two senses. First, it has brought about a change in Equifax's practices that will address the complaints of Chakejian, Summerfield, Webb, and other class members. Second, it has done so without requiring class members to forego their right to sue Equifax for actual damages. Given these innovations, this factor also counsels in favor of granting the attorney's fees request.

In conclusion, both the lodestar method and the percentage-of-recovery method point to the reasonableness of the attorney's fees requested in this case, and I will grant Plaintiffs' motion for an award of $1,075,000 to class counsel.

### D.  Award to Class Representatives

Finally, Plaintiffs' counsel seek approval of a $15,000 individual settlement award for each representative Plaintiff.

"Incentive awards are not uncommon in class action litigation . . . ." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); *see also Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *63 (same). "These payments "compensate named plaintiffs for the

services they provided and the risks they incurred during the course of class action litigation." *Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *64 (quotation omitted). Incentive awards also "'reward the public service' of contributing to the enforcement of mandatory laws." *Id.* (quoting *In re Cendant*, 232 F. Supp. 2d at 344). "Judges of this district have not hesitated to assure that those undertaking class litigation are not penalized for placing a class's interest above their own." *Cullen*, 197 F.R.D. at 145 (citing *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525 (E.D.Pa.1990)); *see also In re Corel*, 293 F. Supp. 2d at 498 (same).

Plaintiffs merit incentive awards in this case. First, they have played a role in the enforcement of the FCRA, persevering in their suits against Equifax for its alleged violations of the statute. Furthermore, these Plaintiffs have brought about substantial benefits to a large group of people, both in the form of free credit reporting services as well as a cessation of Equifax's complained-of practices. Plaintiffs have also participated substantially and crucially in the litigation. Chakejian appeared for trial, Chakejian and Summerfield were deposed, and all three representative Plaintiffs made themselves generally available for consultation with counsel as necessary. Mem. Supp. Mot. for Award of Attorney's Fees 17.[21] Another important consideration is that Plaintiffs have foregone their right to bring suit for actual damages. There have been no objections to their recovery of $15,000 each,[22] and finally, the $15,000 sum is within the range of incentive awards recently accepted by other courts. *See, e.g.*, *Bredbenner*, 2011 U.S. Dist. LEXIS 38663, at *68 ($10,000); Dewey v. Volkswagen of Am., 728 F. Supp. 2d 546, 616 (D.N.J. 2010) ($10,000); *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 467 (E.D. Pa.

---

[21] Although the three representative Plaintiffs appear to have had differing levels of involvement in the litigation, I will nevertheless approve equal incentive awards for all three. All three brought about the benefit to the class, and all three have foregone their rights to bring individual suits against Equifax for actual damages.

[22] Although Mr. Lichtenstein did object to the terms of the settlement and attorney's fees, his objection did not reference the incentive award requests of the named Plaintiffs. Mem. Supp. Mot. for Award of Attorney's Fees 18; Notice of Objection to Settlement.

2008) ($7,500 and $15,000); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 U.S. Dist. LEXIS 569, at *23 (E.D. Pa. Jan. 3, 2008) ($30,000); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 U.S. Dist. LEXIS 10532, at *57-58 (E.D. Pa. June 2, 2004) ($25,000). For all of these reasons, I will grant Plaintiffs' request for $15,000 in personal incentive awards.

## IV. Conclusion

For the reasons set forth above, I will grant Plaintiffs' Motion for Final Approval of Class Action Settlement and Motion for Award of Attorney's Fees and Costs and Award to Representative Plaintiffs. I will also enter a final judgment and dismiss this case with prejudice pursuant to the parties' agreement.

_____ s/ Anita B. Brody _____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:    Copies **MAILED** on _____ to: